# EXHIBIT A

1

1    UNITED STATES BANKRUPTCY COURT
     DISTRICT OF NEW JERSEY
2    CASE NO. 09-13545 (NLW)

3

4    IN RE:                              )
                                         )
5    STANLEY F. KLEINSCHMIDT and         )
     CORRINE A. KLEINSCHMIDT,            )
6                                        )    DEPOSITION OF:
               Debtors.                  )
7                                        )    STANLEY F.
     _____ )    KLEINSCHMIDT
8                                        )
                                         )
9                                        )
                                         )

10

11

12         TRANSCRIPT of the stenographic notes of

13    the proceedings in the above-entitled matter, as

14    taken by and before LINDA M. HOFFMANN, a Certified

15    Court Reporter and Notary Public of the State of New

16    Jersey, held at the office of PORZIO, BROMBERG &

17    NEWMAN 100 Southgate Parkway, Morristown, New Jersey,

18    on Tuesday, June 2, 2009, commencing at 1:34 p.m.

19

20

21

22

23

24

25    Job No.: 203715

**2**

1  APPEARANCES:
2
3  STANZIALE & STANZIALE, P.C.
   BY: BENJAMIN A. STANZIALE, ESQ.
4  29 Northfield Avenue
   Suite 201
5  West Orange, New Jersey 07052
   Attorneys for Debtors
6
7  PORZIO, BROMBERG & NEWMAN, P.C.
   BY: TERRI ANNE FREEDMAN, ESQ.
8  100 Southgate Parkway
   Morristown, New Jersey 07962-1997
9  973-538-4006
   Special Counsel to Chapter 7 U.S.
10 Trustee
11
   SAIBER LLC
12 BY: UNA KANG, ESQ.
   One Gateway Center
13 13th Floor
   Newark, New Jersey 07102
14 973-622-3333
   Attorneys for Creditors, Robert
15 Berman, RHB Realty LLC, Craig
   Seminara, Kerry Seminara, Michael
16 Ruppe
17
18
19
20
21
22
23
24
25

**3**

1                    INDEX
2  WITNESS    DIRECT CROSS REDIRECT RECROSS
3  STANLEY F.
   KLEINSCHMIDT
4  BY MS. FREEDMAN: 4        89,97
   BY MS. KANG      74
5
6
7                  EXHIBITS
8  NO.    DESCRIPTION              PAGE
9  T-1    Total Monies Received From
          Mark Gordon August 4, 2008
10        Closing, 2 pages ............. 29
   T-2    Closing Statement............. 29
11 T-3    Mortgages .................... 29
   T-4    Agreement - Revised
12        8/14/2008 ................... 42
13
14          SPECIAL REQUESTS
               PAGE  LINE
15
   Mortgage Note      22   5
16 Appraisal done by   27   4
   Mark Gordon
17 Complete letter     43   7
   dated August 15,
18 2008, Sclar to
   Usignol, Title
19 Company
   Court Order, Emanse  64   5
20 Estate v. DSK
   Operating Agreement,  72   7
21 DSK Contractors
22
23
24
25

**4**

1  STANLEY F. KLEINSCHMIDT, residing at 22 Oakwood
2  Avenue, Mine Hill, New Jersey, having been duly sworn
3  by the Notary Public, testified as follows:
4  DIRECT EXAMINATION BY MS. FREEDMAN:
5      Q.   Good afternoon Mr. Kleinschmidt.  My
6  name is Terri Freedman.  I'm counsel with the firm of
7  Porzio, Bromberg & Newman.
8      A.   Hi, Terri.
9      Q.   And we represent the Chapter 7 Trustee
10 David Wolff, and we've been asked to investigate your
11 business affairs and the business affairs of your
12 wife Corinne Kleinschmidt, and the business affairs
13 of DSK Properties and DSK Contractors?
14     A.   Okay.
15     Q.   All of who whom are debtors in
16 bankruptcy.
17         (A discussion takes place off the
18 record.)
19     Q.   Are you represented by an attorney
20 today?
21     A.   Yes, I am.
22     Q.   And who is that?
23     A.   It's Benjamin Stanziale.
24     Q.   Okay.  Have you ever been deposed
25 before?

**5**

1      A.   Never.
2      Q.   Okay.  I'm going to give you some ground
3  rules.  I ask the questions and you provide answers.
4  The answers all must be verbal.
5      A.   Um-hum.
6      Q.   The court reporter cannot take down a
7  gesture or a nod of the head.  If you don't
8  understand something that I'm saying or you don't
9  understand a question I'm asking, please tell me and
10 I'll try to rephrase it so you better understand what
11 I'm asking you.
12     A.   Sure.
13     Q.   If you answer a question I'm going to
14 assume that you do understand the question.
15         Let me finish all questions before you
16 answer them.  And do you understand that you're under
17 oath today?
18     A.   Yes, I do.
19     Q.   Is there anything preventing you from
20 telling the truth today?
21     A.   Absolutely not.
22     Q.   Are you under the influence of any
23 medications or drugs?
24     A.   No, I'm not.
25     Q.   Did you understand my instructions?

2 (Pages 2 to 5)

S. Kleinschmidt - direct

|  | 6 |
|---|---|
| 1 | A.   Yes, I do. |
| 2 | Q.   Do you have any questions about the |
| 3 | proceedings? |
| 4 | A.   No, I don't. |
| 5 | Q.   Okay.  And do you understand the court |
| 6 | reporter is going to prepare a transcript of |
| 7 | everything that's said and that transcript may be |
| 8 | placed into evidence if we ever get that far in |
| 9 | court? |
| 10 | A.   Yes, I do. |
| 11 | Q.   Okay.  Very good. |
| 12 |      Are you presently here today because of |
| 13 | a subpoena that was sent to you or sent to your |
| 14 | attorney? |
| 15 | A.   Yes. |
| 16 | Q.   And did you respond to the document |
| 17 | request that was included in that subpoena? |
| 18 | A.   Yes. |
| 19 |      MR. STANZIALE:  I have additional |
| 20 | documents with regard to the insurance that I can |
| 21 | provide to you. |
| 22 |      MS. FREEDMAN:  Thank you.  This is the |
| 23 | proof of insurance on which properties? |
| 24 |      MR. STANZIALE:  Both. |
| 25 |      MS. FREEDMAN:  Both properties?  Very |

|  | 7 |
|---|---|
| 1 | good.  Thank you so much. |
| 2 | Q.   Were any documents withheld for any |
| 3 | reason? |
| 4 | A.   No. |
| 5 | Q.   Okay.  You already gave us your name and |
| 6 | address.  May I have your telephone number, please? |
| 7 | A.   Sure, 973-328-0729. |
| 8 | Q.   And your Social Security number? |
| 9 | A.   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. |
| 10 | Q.   And have you ever used any other name or |
| 11 | alias? |
| 12 | A.   Never. |
| 13 | Q.   And your address. |
| 14 | A.   22 Oakwood Ave., Mine Hill, New Jersey, |
| 15 | 07803. |
| 16 | Q.   And how long have you lived there? |
| 17 | A.   Since 2001, February, 2001. |
| 18 | Q.   Who do you reside with? |
| 19 | A.   My wife Corinne. |
| 20 | Q.   And do you have children? |
| 21 | A.   Yes, I do. |
| 22 | Q.   And their ages? |
| 23 | A.   I have a daughter Lisa that's 19, June |
| 24 | 8th she'll be 20. |
| 25 |      And I have a stepson who is 15. |

|  | 8 |
|---|---|
| 1 | Q.   He does not reside with you? |
| 2 | A.   No, he resides in California as of |
| 3 | December. |
| 4 | Q.   Okay. |
| 5 | A.   With his father. |
| 6 | Q.   Okay.  And can we just briefly go |
| 7 | through your educational background. |
| 8 | A.   Yes. |
| 9 | Q.   Did you graduate from high school? |
| 10 | A.   Yes, I do. |
| 11 | Q.   And where? |
| 12 | A.   Morris Knolls High School, Denville, New |
| 13 | Jersey. |
| 14 | Q.   And did you attend college? |
| 15 | A.   No, I didn't. |
| 16 | Q.   Is high school your highest degree? |
| 17 | A.   Yes. |
| 18 | Q.   All right.  Do you have any |
| 19 | post-graduate education? |
| 20 | A.   No. |
| 21 | Q.   And for whom do you currently work? |
| 22 | A.   I work for Mountain Landscape |
| 23 | Contractors. |
| 24 | Q.   And for how long have you been employed |
| 25 | by -- |

|  | 9 |
|---|---|
| 1 | A.   Six weeks. |
| 2 | Q.   Let me finish my question.  It's just |
| 3 | harder for her if we interject.  Mountain Landscape. |
| 4 | Sorry? |
| 5 | A.   Mountain Landscape Contractors. |
| 6 | Q.   Six weeks? |
| 7 | A.   Yes. |
| 8 | Q.   And what is your current salary? |
| 9 | A.   $72,500. |
| 10 | Q.   And where did you work prior to Mountain |
| 11 | Landscape Contractors? |
| 12 | A.   I've been self-employed doing real |
| 13 | estate.  I'm a licensed Realtor for 21 years. |
| 14 | Q.   And is this your first job with a |
| 15 | company? |
| 16 | A.   In 21 years. |
| 17 | Q.   Your first salary? |
| 18 | A.   That's any job in 21 years besides being |
| 19 | self-employed through real estate, if you will. |
| 20 | Q.   For some reason, I thought you were |
| 21 | employed by a bank. |
| 22 | A.   No. |
| 23 | Q.   No? |
| 24 | A.   No.  No, I've been a licensed Realtor |
| 25 | since 1988 in a full-time position selling real |

3 (Pages 6 to 9)

S. Kleinschmidt - direct

10

1  estate, residential mainly, and that's what I've
2  done.
3      Q.    And were you always employed by yourself
4  or did you work for an agency?
5      A.    I worked for different brokers, yes,
6  throughout the years.
7      Q.    Are you currently still selling real
8  estate?
9      A.    Yes.
10     Q.    And with which broker?
11     A.    Real Estate Consultants in Randolph.
12     Q.    And are you an owner of that company?
13     A.    No. I am just an agent, sales agent.
14     Q.    Does Corinne work there, as well?
15     A.    Yes.
16     Q.    Okay. Now, some of the questions that
17  I'm going to be asking you, you may have previously
18  answered when you were at the 341 meeting with Mr.
19  Wolff, and I apologize in advance for that. I wasn't
20  there and I don't know everything that was covered,
21  so if I repeat myself or repeat any questions, that's
22  the way it is.
23     A.    Yes.
24     Q.    What is DSK Properties, LLC?
25     A.    DSK Properties, LLC, I'm the sole

11

1  proprietor of it. It was a dormant company. It was
2  really set up to purchase land when I could invest in
3  land, or if I had an opportunity to buy anything
4  investment-wise for real estate. And also for -- set
5  up so I could do maybe some side jobs as far as
6  general contracting. Okay?
7      Q.    So are you also a general contractor?
8      A.    Yes.
9      Q.    When you say it was dormant or it is
10  dormant?
11     A.    Well, it is dormant now. I mean, it's
12  basically defunct, you know, so...
13     Q.    Okay.
14     A.    It's closed.
15     Q.    And what was the business address of DSK
16  Properties?
17     A.    Same as the house address, 22 Oakwood
18  Ave., Mine Hill, New Jersey.
19     Q.    And is it New Jersey incorporated?
20     A.    It's not incorporated. It was just an
21  LLC. It was formed in 2004.
22     Q.    And who are the shareholders?
23     A.    Just me.
24     Q.    You said that. Sole proprietorship.
25  Okay. And you said 2004?

12

1      A.    Um-hum.
2      Q.    Now defunct. Does it own any properties
3  currently?
4      A.    Never did.
5      Q.    Never owned any properties?
6      A.    No, never purchased one piece of real
7  estate.
8      Q.    Now, for 21 years you were a real estate
9  broker. Can you just describe the types of deals
10  that you would do?
11     A.    Just residential sales.
12     Q.    Residential sales, and that was it?
13     A.    That's it.
14     Q.    Did you purchase properties for
15  yourself, to flip for yourself?
16     A.    I didn't purchase anything. With a
17  partner I did. That was something different, not
18  with me personally.
19     Q.    What is DSK Contractors?
20     A.    DSK Contractors was a joint venture that
21  I formed with a friend, and that was formed in 1999.
22     Q.    Who is the friend?
23     A.    Dean Smith. So Dean Smith and I joined,
24  you know, ventured together to build homes, spec
25  properties, because of my experience in construction.

13

1      Q.    Build homes and inspect properties?
2          MR. STANZIALE:  No, spec.
3      A.    Spec. Speculate building, yeah, spot
4  lots. That's all.
5      Q.    Okay.
6      A.    Yes.
7      Q.    And how many properties does DSK
8  Contractors currently own?
9      A.    We don't own any properties. We have
10  two vacant lots in Chester Township.
11     Q.    And what's the address of DSK
12  Contractors?
13     A.    1037 Route 46, Clifton, New Jersey.
14     Q.    Is that also an LLC?
15     A.    That's an LLC, yes.
16     Q.    Okay. And what is your intention with
17  regards to the two vacant lots?
18     A.    Well, we had them sitting there.
19  They're buildable lots. And we paid on those
20  properties. And after 18 months went by for
21  construction loans, the bank getting all the
22  interest, then they decided to serve us with
23  foreclosure. So those both lots are in foreclosure.
24     Q.    And which bank is that?
25     A.    Boiling Springs Savings Bank. It's in

4 (Pages 10 to 13)

S. Kleinschmidt - direct

---

**14**

1 Rutherford, New Jersey.
2    Q.    Have they filed a motion for relief to
3 continue with the foreclosure actions?
4    MR. STANZIALE:  They did not because
5 they sent a letter saying that since DSK
6 Properties -- no, DSK Contractors is the owner of the
7 properties, they have not filed bankruptcy so the
8 State has not applied, and they cited the case law.
9    MS. FREEDMAN:  Oh, I thought they were a
10 debtor.
11    Q.    I'm sorry, just you and Corinne are
12 debtors?
13    MR. STANZIALE:  Yes.
14    A.    Um-hum.
15    Q.    I thought it said d/b/a?
16    MR. STANZIALE:  I named them because we
17 were naming so many creditors that were part of those
18 LLCs that he may have personal guarantees on, so I
19 put that in the petition so that people would
20 recognize who it is or what it's for.
21    MS. FREEDMAN:  Okay.  I thought DSK
22 Properties and DSK Contractors were both debtors, as
23 well?
24    MR. STANZIALE:  No.
25    Q.    So it's just the two of you.

---

**15**

1    A.    Yes.
2    Q.    Okay.  So those foreclosures are
3 proceeding?
4    A.    Yeah, for over a year.
5    Q.    Are you contesting those foreclosures?
6    A.    No.
7    Q.    Do you have personal guarantees on those
8 properties?
9    A.    No.
10    Q.    Is Dean Smith a creditor of yours
11 personally?
12    A.    No.  He was a partner, joint venture.
13    Q.    Okay.  Getting back to the residential
14 sales.  You also stated that you would flip property
15 or you would buy properties separately from your --
16    A.    No, I started the company with that idea
17 in mind.  Never materialized.
18    Q.    Which company?
19    A.    DSK Properties.
20    Q.    Properties.  Okay.
21    A.    Yeah.
22    Q.    Was DSK Contractors the only entity
23 through whom you did buy either properties or raw
24 land --
25    A.    Yes.

---

**16**

1    Q.    -- or whatever?
2    At this point, other than the two empty
3 lots, Mine Hill, and the property in Chester, 318
4 Grove Center --
5    A.    That's Randolph, 318 Center Grove Road.
6    Q.    I meant Randolph -- do you own any other
7 properties?
8    A.    No, I do not.
9    Q.    The gist of why I have you in here today
10 is to talk about the mortgage with Mark Gordon, and I
11 want to understand that transaction in detail.
12    A.    Okay.
13    Q.    Okay?  So we're going to discuss the
14 Mark Gordon mortgage now.
15    A.    Um-hum.
16    Q.    I'm looking for a complete description
17 of your dealings with Mr. Gordon.  Do you understand
18 that?
19    A.    Sure.
20    Q.    Okay.  It's really important that I find
21 out everything there is to know about that
22 transaction so I'm not surprised by something down
23 the road, and there's no problems between me and you
24 or me and Mr. Gordon.  So does that sound fair?
25    A.    Sure.

---

**17**

1    Q.    Okay.  Who is Mark Gordon?
2    A.    Mark Gordon is somebody I was introduced
3 to by a mutual friend.
4    Q.    Who is that mutual friend?
5    A.    Tony Gindon.  He lives over in Randolph.
6    Q.    How do you spell "Gindon"?
7    A.    I'll say G-I-N-D-O-N.
8    Q.    And that was in -- they both live in
9 Randolph?
10    A.    He lives in Randolph.  Mark Gordon lives
11 in Morristown.
12    Q.    And did you know him before?
13    A.    Who, Mark?
14    Q.    I'm sorry.  You were introduced to him
15 by Tony Gindon.  How long ago were you introduced to
16 him?
17    A.    It was last summer.  I guess maybe it
18 was end of June.
19    Q.    And how did the opportunity present
20 itself for Mr. Gordon to lend you money?  I mean, how
21 did the whole transaction come about?
22    A.    I was looking for additional money to
23 finish this home on 318 Center Grove Road.  I needed
24 a private lender because at that point my credit had
25 been affected.

---

5 (Pages 14 to 17)

S. Kleinschmidt - direct

---

**18**

1　　　And Tony had said to me, "I know
2　somebody who does mortgages, I'll see if he can help
3　you."
4　　　So he had introduced me for the first
5　time at his office, at Tony's office in Roxbury. And
6　Mark came in and Mark basically had worked for
7　another company, and said, "You know, per your
8　credentials on a conventional, I don't know if I can
9　help you." So that was the end of the meeting, so we
10　never pursued it.
11　　　MR. STANZIALE: Just so we understand,
12　when you say another company, you mean a mortgage
13　company?
14　　　THE WITNESS: Yes, another mortgage
15　company. He worked for a mortgage company that was
16　doing conventional lending.
17　　　After I explained my situation to him,
18　then he saw it could be a problem maybe, so we didn't
19　bother talking any more about it. We just let it be.
20　　　And then later on --
21　　Q.　How much time passed?
22　　A.　-- in August. This is August -- well,
23　no, this is July, he had told Tony he apparently
24　changed mortgage companies, or did something with
25　another mortgage company, he thought he might be able

---

**19**

1　to help me, so Tony had set up another meeting at the
2　house.
3　　　And we went out to the house, and you
4　know, Mark saw the property, and Mark said, "I'll let
5　you know tonight."
6　　　And basically he said that he was going
7　to be able to provide a second mortgage for the
8　amount of $350,000 and the interest associated to
9　that for eight to ten months, with an extension would
10　be $100,000 in interest, so a total mortgage of
11　$450,000.
12　　Q.　So it was $100,000 in interest --
13　　A.　Um-hum.
14　　Q.　-- for eight to ten months of time.
15　　A.　Um-hum.
16　　Q.　Did it strike you as unusual that the
17　interest would be so incredibly high?
18　　A.　Yes.
19　　Q.　Was this loan provided through an entity
20　or by Mr. Gordon personally?
21　　A.　Through Mr. Gordon personally. All the
22　documents I submitted to the courts through my
23　attorney support the closing documents that took
24　place.
25　　Q.　I've seen a mortgage. I've never seen a

---

**20**

1　note or any other document.
2　　A.　All of the papers were turned in.
3　　　MR. STANZIALE: There's no other
4　documents.
5　　　MS. FREEDMAN: There's no other
6　documents than the mortgage?
7　　　MR. STANZIALE: It's a mortgage note, I
8　believe, is what whoever prepared it.
9　　　Who was the attorney?
10　　A.　Victoria Brown. And she also did a
11　closing statement which all of that was turned in.
12　All the breakdown of all the costs.
13　　Q.　I have all of that and we'll walk
14　through all of that.
15　　A.　Yeah.
16　　Q.　But somewhere, I read in one of the
17　documents there was a note prepared, an actual note,
18　and I've never seen a note.
19　　A.　And there was a mortgage and a note
20　prepared, yes.
21　　Q.　I mean, there's a mortgage and it
22　says --
23　　　MR. STANZIALE: Do you have the
24　mortgage, Terri, in front of you?
25　　　MS. FREEDMAN: I have the mortgage right

---

**21**

1　in front of me.
2　　　MR. STANZIALE: Is it a mortgage note or
3　just a mortgage?
4　　　MS. FREEDMAN: Just a mortgage.
5　　　MR. STANZIALE: Okay.
6　　Q.　And just so you know, I have sent a 2004
7　subpoena to Victoria Brown for Mr. Gordon. I've
8　asked for copies of the note or any other
9　documentation that he has.
10　　　Yes, here we are. In the first
11　paragraph, it says, "To secure the payment of an
12　indebtedness in the sum of $450,000 lawful money in
13　the United States to be paid in accordance with the
14　note signed by borrowers on even date hereof
15　providing for a balloon payment of March 1st, 2009,
16　according to a certain note bearing even date
17　herewith."
18　　　Do you recall signing a note?
19　　A.　From the best of my memory, there was
20　always a mortgage and a note. Always typically at a
21　closing of real estate.
22　　Q.　Agreed, but why don't we have a copy of
23　the note, is what I'm trying to understand.
24　　A.　I don't know. I know I produced
25　everything that I had. It was very straightforward.

---

6 (Pages 18 to 21)

S. Kleinschmidt - direct

**22**

1  It's a very recent, pretty much recent document and I
2  have everything organized.
3      Q.    Well, I just want to ask you if you
4  would look for it one more time because I haven't
5  seen the note?
6      MR. STANZIALE:  I'll look for it, too.
7      A.    I can certainly produce it. I thought
8  you have it because it was produced and checked off
9  as a received item from Mr. Wolff.
10     Q.    I have Mr. Wolff's file and it's just
11 not in there. I don't know what happened.
12     Okay. Did you ask him why, why the
13 interest was so high?
14     A.    Well, that was the cost of doing
15 business for him, to provide a second mortgage,
16 private mortgage, for his risk and whatever he --
17 that's what he wanted.
18     Q.    Do you recall what the exact interest
19 rate is in the note?
20     A.    In the note it doesn't say. It's -- I
21 don't know what the wording is, okay, but it's not
22 made as an interest rate.
23     Q.    Okay.
24     A.    Okay? Because obviously, the usury
25 laws.

**23**

1      Q.    Correct.
2      A.    Okay. So however it was worded by
3  Miss Victoria Brown, I don't remember it. You know,
4  I don't have it in front of me.
5      Q.    Okay. So Mr. Gordon agreed to lend you
6  $350,000 --
7      A.    Um-hum.
8      Q.    -- for eight to ten months at the rate
9  of $100,000 in interest.
10     A.    Yes.
11     MR. STANZIALE:  Well, there was another
12 thing you said about an extension or something.
13     THE WITNESS:  Yeah, there was an
14 extension.
15     MR. STANZIALE:  Explain that so there's
16 no confusion, and whether or not the extension added
17 interest or added money or whether the 100 covered
18 the extension.
19     A.    After ten months there would be an
20 additional $3,000 per month due, I think, unless it
21 was $3,500, I am not sure. And at that point, we
22 would have the right to either buy each other out, or
23 come to a fair market value within $50,000
24 conservatively and market the house. But the
25 paperwork that we have will show everything. It's

**24**

1  very clear.
2      Q.    It's all spelled out in the note?
3      A.    Very clear. You should have a copy of a
4  joint venture.
5      Q.    I do have any of it.
6      A.    There was a joint venture, a note, and a
7  mortgage.
8      Q.    All I have is the mortgage, which is why
9  I'm confused about all these facts. I just don't
10 have it.
11     A.    And I turned it in, just so you know.
12     MR. STANZIALE:  I think that was in the
13 original package we brought to Mr. Wolff when we went
14 to meet him prior to the 341.
15     MS. FREEDMAN:  Do you have it?
16     MS. KANG:  No.
17     MS. FREEDMAN:  We're definitely missing
18 documents.
19     A.    Those are the three main documents of
20 everything, yeah.
21     Q.    Well, I've requested the same documents
22 from Mr. Gordon, but if you can get them to me this
23 week, it would be very, very helpful.
24     So at the end of ten months -- I'm
25 sorry. Let me back up for a second.

**25**

1      The balloon payment was to be made on
2  March 1st, 2009. When was your bankruptcy filed?
3      A.    It was February 14th.
4      MR. STANZIALE:  13th.
5      A.    February 13th.
6      Q.    So the balloon payment never became due?
7      A.    No.
8      Q.    Did Mr. Gordon know you were going to
9  file bankruptcy?
10     A.    No, I didn't know I was going to,
11 either. I had asked him for more money. We had
12 talked about it a month after the original closing
13 because -- well, I won't bother. I'll just wait for
14 you to ask the questions.
15     Q.    Why don't you go ahead and tell me.
16 After the first closing?
17     A.    After the first closing, 30 days later,
18 you know, from that closing, I needed $350,000 to
19 finish this home and then tentatively to sell it.
20     Well, from the closing I did not receive
21 $350,000. I only received a net of $217,000 and
22 change, because there were two judgments that were in
23 the meantime that took place.
24     Q.    Okay.
25     A.    And when they did their searches, then

7 (Pages 22 to 25)

S. Kleinschmidt - direct

---

**26**

1  they saw these judgments. They had to be settled.
2  So by the time they were settled, you know, fees,
3  taxes, everything that's on the HUD, that's what I
4  ended up netting.
5       So I told him, you know, I said, "Mark,
6  I want to meet with you so we can discuss this money
7  because I didn't net now the money I needed and I'm
8  going to need more money to finish."
9       And I met with him and his girlfriend
10  over at the Calaloo Cafe in Morristown. And since
11  then we were talking about getting more money and
12  getting an appraisal and coming over and seeing the
13  work with the money that was being spent, and so
14  forth.
15       Q.    So for the 217,000, he wanted to see
16  what his money had gotten him?
17       A.    Well, No, we were starting that process
18  and he had to come over. But anyway from the
19  beginning, I never got $350,000. How could I
20  possibly finish the house based on what I needed?
21       Q.    Did he agree to lend you more money?
22       A.    No, we were trying to establish that.
23  He said he would if he could, but it never
24  materialized. And on December 24th I received a
25  phone call from his girlfriend saying, "You know,

---

**27**

1  we're not going to be able to. Based on the
2  appraisal, the investor does not want to give any
3  more money.
4       Q.    And do you have a copy of the appraisal?
5       A.    Yeah, it was turned in.
6       Q.    Another document that was turned over?
7       A.    Yes, it was.
8       Q.    What did the appraisal show the value of
9  the property to be?
10       A.    Completed at that time in December would
11  be a million five. And there's, by the appraisals
12  breakdown, if you see for repairs and the total final
13  finished product, not counting a septic system, would
14  be $25,000 that wasn't on there. You know, there's,
15  you know, about $300,000.
16       Q.    You've got $300,000 in equity?
17       A.    No, $250,000 worth of expenses still to
18  finish the home. And when finished, they were
19  projecting a million five at that time.
20       Q.    Okay.
21       A.    And that was in December.
22       Q.    And where does -- how does the house
23  stand now? Does it still need $250,000?
24       A.    The same condition.
25       Q.    So it needs about $250,000 worth of

---

**28**

1  work?
2       A.    Um-hum.
3       Q.    Have you received any other appraisals
4  since December?
5       A.    No. They did their own appraisal.
6       Q.    Who's that?
7       A.    Mark Gordon did his appraisal. He did
8  his appraisal for his value.
9       Q.    No, I understand. That's the appraisal
10  we're talking about.
11       A.    Correct.
12       Q.    Were any other appraisals done?
13       A.    No.
14       MR. STANZIALE: Well, with the exception
15  of the market analysis.
16       A.    There was a market analysis done by, as
17  far as an agent that was selected by -- was it Mr.
18  Wolff?
19       MR. STANZIALE: No, no, not that. Mr.
20  Wolff did an appraisal, correct, but we also -- you
21  supplied a market analysis to Mr. Wolff.
22       MS. FREEDMAN: Yes, I saw that. I saw
23  the market analysis. Okay.
24       A.    Yeah.
25       Q.    Okay. I'm going to show you a few of

---

**29**

1  the documents that I received.
2       Does that document look familiar?
3       A.    Yeah, it looks familiar.
4       Q.    Did you prepare that?
5       A.    It's something that was probably copied
6  from all the papers that were done at the closing,
7  yes, um-hum.
8       MS. FREEDMAN: I'm going to mark that.
9  I need to give it to the court reporter.
10       (Exhibit T-1, Total Monies Received From
11  Mark Gordon August 4, 2008 Closing, 2 pages was
12  received and marked for identification.)
13       Q.    Okay. So you are familiar with T-1?
14       MR. STANZIALE: Yes or no?
15       A.    Yes.
16       MR. STANZIALE: Okay.
17       Q.    And then a second document is this
18  closing statement. Does that look familiar?
19       A.    Um-hum, yes, it does.
20       Q.    And who prepared that closing statement?
21       A.    Victoria Brown, Mark Gordon's attorney.
22       Q.    Let's call this T-2.
23       (Exhibit T-2, Closing Statement was
24  received and marked for identification.)
25       (Exhibit T-3, Mortgages were received

---

8 (Pages 26 to 29)

S. Kleinschmidt - direct

---

**30**

1  and marked for identification.)
2      Q.    I'd like to walk through the closing
3  statement with you so you can explain it all to me.
4          MR. STANZIALE:  Which would be T --
5      Q.    T-2?
6          MR. STANZIALE:  T-2.  Okay.
7      Q.    So we have a closing statement Mark
8  Gordon mortgage to Kleinschmidt 318 Center Grove
9  Road, $360,000 mortgage.  Did you receive $360,000?
10      A.    No, I didn't.  Mark Gordon took $10,000
11  in advance on the $100,000 interest concept, which
12  was news to me at the closing.  So if you see the
13  documents that will follow the mortgage, the note,
14  and the joint venture agreement, it says the
15  remainder is only $90,000.  So he took $10,000 up
16  front at this closing.  I don't know why, but you're
17  not supposed to do that.
18      Q.    Then we have the costs of closing.
19      A.    Um-hum.
20      Q.    Legal fees to Victoria Brown.
21      A.    Right.
22      Q.    Cost of filing, loan origination fee.
23  That's the $10,000 you're speaking of?
24      A.    This is what he took in advance, yes.
25      Q.    Okay.  And he called it a loan

---

**31**

1  origination fee.  Title company.  So all those things
2  total up to 14,628.
3      A.    Um-hum, yes.
4      Q.    And again, you weren't expecting to pay
5  the $10,000 loan origination fee?
6      Q.    You don't get interest up front.  Right?
7      Q.    Well, he called it an origination fee.
8      A.    I know what he called it.  It was a
9  false title.
10      Q.    Had he ever told you he was going to
11  take an origination fee or he was expecting an
12  origination fee?
13      A.    Not that money, no, absolutely not.
14      Q.    Did he ever tell you he was expecting
15  any type of fee at closing?
16          MR. STANZIALE:  Or upfront interest.
17      A.    Not upfront interest, no.  There was
18  going to be a fee, okay, but it wasn't going to be
19  that, no.
20      Q.    What was the fee that he had told you to
21  expect to pay at closing?
22      A.    I was expecting to pay a total of
23  $15,000, okay, for points, or whatever you want to
24  call it.  Typically with a mortgage, okay, and it
25  turned out to be much more than that.

---

**32**

1      Q.    You expected to pay $15,000 to Mark
2  Gordon, or your total expense cost of the closing?
3      A.    Let me say this to you.  The original
4  amount of interest talked about on this transaction,
5  okay, was going to be about $75,000.
6      Q.    Okay.
7      A.    It grew to 100.  Okay?  And with that,
8  the $100,000 in interest, which is clearly stated in
9  these documents, he decided to take $10,000 of that
10  100 at this closing.  Because I received 350, I was
11  supposed to receive 350.  Okay?  Obviously I did
12  receive the 350, but 360 was disbursed.
13      Q.    Okay.
14      A.    Ten of it going to him.
15      Q.    So what $15,000 in points are you
16  referring to?
17      A.    Well, as far as $75,000 plus 15,000
18  would have been -- points and fees, would have been
19  90, not 100.
20      Q.    Ninety.  Okay, okay.
21      A.    Um-hum.
22      Q.    Who is Nicole Rozgonyi?
23      A.    That's Mark Gordon's girlfriend.
24      Q.    Okay.  Why did you pay her $9,500?
25      A.    Because we were in a very tight

---

**33**

1  situation, so when he created the second mortgage for
2  us, okay, the Friday before the closing, he agreed to
3  come over and help us with $9,500 in cash.  Okay?
4  And then we would take it out of the loan for, you
5  know, the paperwork for the closing on Monday.
6      Q.    Why did you need the $9,500 on Friday?
7      A.    Because I was broke.
8      Q.    So he was giving you money a couple days
9  early?
10      A.    Yes.
11      Q.    Okay.  Do you know, did that money come
12  from her?
13      A.    I don't know where -- I don't know what
14  account it came out of.  I just know that I was given
15  the money, and he created a note for that, which
16  should be included in that paperwork, also, which I
17  supported, which I have.  And the note said to her
18  for $9,500, and it was marked paid the day at the
19  closing and signed, and obviously it was taken out on
20  the HUD here for that repayment.
21      Q.    So it was not a situation where she had
22  a lien or a mortgage --
23      A.    No.
24      Q.    -- or any type of security interest --
25      A.    No, absolutely not.

9 (Pages 30 to 33)

S. Kleinschmidt - direct

34

1     Q.    -- in the property?
2     A.    No, absolutely not.
3     Q.    So it did not come as a surprise the day
4 of the closing that you were going to be paying her
5 back $9,500?
6     A.    No.
7     Q.    Okay. Next there are some payments, I
8 guess real estate taxes?
9     A.    Yes.
10     Q.    And it just -- there's a number of
11 $1,671.53 crossed out?
12     A.    Right. This is on the second page. You
13 see the revised number she did at the closing. It
14 was 1,725.27 paid to the Township of Randolph,
15 because there was a couple days of interest, I guess,
16 difference from the time she mailed the check in, so
17 that was revised on her sheet here.
18     Q.    Okay. And the third quarter taxes
19 escrowed by VB, meaning Victoria Brown?
20     A.    Correct. Another $8,763.53.
21     Q.    And those payments were made by Victoria
22 Brown?
23     A.    Yes, they were.
24     Q.    Then there was money that was escrowed.
25     A.    That's correct, $248,562.

35

1     Q.    It says that money was escrowed and held
2 by Mark Gordon and transferred by wire transfer to
3 Victoria Brown on 8/12.
4         Can you explain the circumstances of
5 those funds?
6     A.    August 4th we had a closing that didn't
7 finish until eleven o'clock at night.
8     Q.    Why?
9     A.    Because the issues for these judgments,
10 okay, the title company had to get on the phone. And
11 for us to have the closing, that's what took place.
12 They had to talk to the title company, and it was
13 resolved around 10:30. I didn't even receive this
14 kind of a HUD at the closing. It was a handwritten
15 HUD that Victoria Brown furnished me with. And I
16 only received partial funds that night. And then
17 that's why this money had to be wired to her account
18 because he never came with the full amount of funds
19 to begin with.
20     Q.    Did you find it odd at all -- I mean,
21 you were a real estate agent.
22     A.    Right.
23     Q.    You've done hundreds of real estate
24 transactions. Is that fair to say?
25     A.    Right, yeah.

36

1     Q.    Did you find this type of what we're
2 calling a HUD a strange document? I mean, it's not a
3 HUD.
4     A.    It's not strange. Well, this was a
5 self-prepared HUD by an attorney. So he's a private
6 lender.
7     Q.    Did you ever see a HUD like this before?
8     A.    No, typically the HUD is structured
9 different. But I was surprised to see the one that
10 she did give me that night which was handwritten.
11     Q.    I've never seen that. Do you have a
12 copy of that?
13     A.    I don't have any of these documents.
14       MR. STANZIALE: That was all part --
15       THE WITNESS: It was all turned in.
16       MR. STANZIALE: That was all part of the
17 initial thing we brought to Mr. Wolff; and quite
18 frankly, I didn't take that part of my file.
19     A.    I'm surprised why these documents are
20 missing from everything I've turned in.
21     Q.    I don't understand it, either.
22     A.    The appraiser that Mr. Gordon, I mean,
23 all these documents.
24       MR. STANZIALE: The appraisal for
25 Mr. Gordon I'm pretty sure was sent directly to you,

37

1 or to Warren, actually.
2       MS. FREEDMAN: Off the record.
3       (A discussion takes place off the
4 record.)
5     Q.    Is this the title insurance document
6 that you were referring to? That's the revised one?
7     A.    This is August 14, revised. There was
8 one prior to this, and they revised it; but these
9 were the judgments and the amounts that were in
10 question. That's what deleted the original 350 which
11 reduced my net to X.
12     Q.    Were you aware of these judgments?
13     A.    Yeah, I wasn't aware of these judgments.
14       So just so you know, there were two of
15 these cases that complaints were filed that my
16 attorney Doug Sclar was handling.
17     Q.    Yes.
18     A.    And he dropped the ball with answering
19 these complaints, so they moved for, you know,
20 judgments. Okay? And they were successful in
21 getting them. He said he was going to reverse them.
22 So at the time of me trying to get secondary
23 financing, okay, to complete this home, they arose as
24 being recorded judgments. And I went to my attorney,
25 obviously very upset, my wife and I, and he said he

10 (Pages 34 to 37)

S. Kleinschmidt - direct

---

**38**

1  was going to get them removed with a motion. Was
2  unsuccessful. And then we ended up having to
3  negotiate these moneys. And that's why it came in to
4  play at the same time I was trying to get money to
5  finish the home; therefore, it reduced the amount I
6  really got as a net that I needed to finish the home.
7      Q.   Okay. Just so I understand.
8      A.   Um-hum.
9      Q.   Complaints were filed against you.
10     A.   Yes.
11     Q.   You believed that your attorney was
12  handling those?
13     A.   He was handling them. He was retained.
14     Q.   He was retained?
15     A.   Absolutely.
16     Q.   He did not file answers?
17     A.   He did not represent me properly.
18     Q.   Okay.
19     A.   And he allowed them to obtain two
20  default judgments. And once they were filed, he
21  could not reverse them.
22     Q.   Do you have any idea why they were not
23  reversed? Do you have an understanding. I know it's
24  a legal question, but do you have any understanding
25  as to why the Court would not reverse the judgments?

---

**39**

1      A.   I don't know. He said nine times out of
2  ten he's successful in reversing a judgment, but
3  because these people saw that I was going to get
4  other moneys, then I guess he chose an avenue of
5  trying to negotiate.
6      Q.   Do you know if he actually filed motions
7  with the Court to reverse the judgments?
8      A.   I didn't see them. I don't know.
9          MR. STANZIALE: I think on one --
10         THE WITNESS: One he did?
11         MR. STANZIALE: One that you didn't show
12  up, or there was some confusion about you showing up,
13  or that's a different case?
14         THE WITNESS: No, no. It was never my
15  fault.
16         MR. STANZIALE: The answer is no.
17     A.   It was not my fault. He dropped the
18  ball entirely with answers to both these complaints.
19     Q.   But there's a few different actions I
20  see here, so I just want to make sure we're talking
21  about the correct one. There's the Seminara action?
22     A.   Correct.
23     Q.   Is that one of the actions that you were
24  talking about?
25     A.   One of the complaints, yes. Wickes

---

**40**

1  Lumber.
2      Q.   Then there's Wickes Lumber.
3      A.   Correct.
4      Q.   And then there's Howard Pfeffer.
5      A.   Howard Pfeffer was for -- actually, that
6  was supposed to be paid, okay, from the actual
7  closing from Miss Brown. She never sent that money.
8      Q.   So is it still outstanding?
9      A.   No. Then we had to pay it again. So
10  that, you know, that money turned into $500 and
11  some-odd dollars and change.
12     Q.   Okay. We can get to that in a second.
13  We'll talk about that in one second.
14     A.   Um-hum.
15     Q.   Okay. The title insurance company
16  agreed to provide this revised agreement --
17     A.   Um-hum.
18     Q.   -- on August 14th based on what? Based
19  on an agreement to make these payments?
20     A.   No. It was really based on how the
21  money was going to be given to them and how the money
22  was going to be released to me per the outcomes on
23  those cases of what the parties negotiated.
24     Q.   And was Mr. Sclar supposed to be
25  negotiating these on your behalf?

---

**41**

1      A.   He did. He did negotiate Wickes and he
2  did negotiate Seminara.
3          There was documents that Seminaras,
4  okay, came to an agreement with my attorney and
5  Mr. Perrucci I believe was their attorney.
6      Q.   And what was the amount of the
7  agreed-upon settlement?
8      A.   Eighty thousand dollars. I received
9  20,000 upon this closing. You should have those
10  documents, also.
11     Q.   And what was the agreement reached with
12  Wickes Lumber?
13     A.   And the agreement reached with Wickes
14  Lumber? Let's see. I believe it's marked here.
15  This is the amount that was paid to Wickes Lumber.
16     Q.   The $50,000?
17     A.   $51,725.27 -- no, I'm sorry. So it was
18  $50,000. Right. Fifty thousand dollars even that
19  they settled for.
20     Q.   So they settled for $50,000 on a
21  $128,000 judgment?
22     A.   That's right, because it was due to a
23  bogus claim from them. Okay? And when they filed a
24  complaint, okay, they had deficiencies in materials,
25  okay, that were provided for the home that I was

---

11 (Pages 38 to 41)

S. Kleinschmidt - direct

---

**42**

1   building, and I refused to pay them. They filed a
2   complaint. And the proof came out at the end they
3   were really only owed X amount of dollars. I could
4   have went after them for damages and time and
5   material, and that's the reason they settled for that
6   kind of money.
7           MS. FREEDMAN: Okay. Mark this as T-4,
8   please.
9           (Exhibit T-4, Agreement - Revised
10  8/14/2008 was received and marked for
11  identification.)
12      Q.   Looking again at the closing statement
13  under Section C, Escrow. Floors by Jimmy Connors.
14      A.   Yes, that was another judgment.
15      Q.   But it's not contained on the title
16  insurance agreement. Correct?
17      A.   It should be. It should have been.
18  Because they were all -- they were all prevalent at
19  the time. That's why it's noted here on the closing
20  statement because that was already a judgment. That
21  judgment for 25,104.20 ended up settling for him, I
22  think it was 23,000 and change.
23      Q.   I mean, I don't see anything regarding
24  that.
25      A.   Well, Mr. Sclar handled that matter,

---

**43**

1   also. All of these matters he handled except Howard
2   Pfeffer. That just came up in a search.
3       Q.   There's a letter here from Mr. Sclar
4   dated August 15th, 2008. I only have the first page
5   of it. I'm assuming there's other pages.
6       A.   What is it about?
7       Q.   What is the letter about? It's to Larry
8   Usignol at First American Title Insurance Company.
9   "This letter follows my telephone call with you today
10  wherein we discussed the following."
11          And I guess they talk about how the
12  escrowed moneys were going to be paid out.
13          MR. STANZIALE: Let me just see.
14      A.   Well, if you only have one page of the
15  letter, I don't, you know. It's not a complete
16  document there.
17      Q.   I know it's not a complete document.
18  I'm looking for the complete document.
19      A.   So the closing took place on August 4th.
20      Q.   Yes.
21      A.   That means my attorney -- first of all,
22  he was not even present at the closing.
23      Q.   Was --
24      A.   Via telephone.
25      Q.   Sclar was there via telephone?

---

**44**

1       A.   On and off. This gentleman here that's
2   referred to here in this conversation that he's
3   writing to --
4           MR. STANZIALE: Larry.
5       A.   Larry? Okay. Was the senior person at
6   the title company to make a decision as to agree to
7   whatever escrows, and how the moneys would be
8   disbursed. I know that.
9           As far as on the 4th there obviously was
10  an agreement outlining the handwritten. If you had
11  it, you would see the moneys that were being held in
12  escrow which this refers to, the amount.
13      Q.   Yeah, I'm just trying to understand.
14      A.   Yeah.
15      Q.   But you're saying there was a judgment
16  against you by Floors By Jimmy Connors?
17      A.   Yes, there was, and it was for that
18  exact amount right there, $25,104.20.
19      Q.   Okay. And the next amount listed is
20  Howard Pfeffer, Esquire?
21      A.   Correct.
22      Q.   414.61?
23      A.   Yes.
24      Q.   And next to it there's a handwritten
25  "PD." Do you see that?

---

**45**

1       A.   Right. Because she was supposed to pay
2   that out of the moneys that were held.
3       Q.   Wasn't she supposed to pay all of these
4   out of the moneys that were held?
5       A.   Yes.
6       Q.   Why would there be a "paid" notation
7   next to that one in particular?
8       A.   I don't know, but that's her
9   handwriting.
10      Q.   That's the only one that says "paid"
11  next to it. That's why I'm asking.
12      A.   Yeah. I have no idea.
13          MR. STANZIALE: Terri, can we just back
14  up for one second?
15          MS. FREEDMAN: Sure.
16          MR. STANZIALE: On the agreement with
17  the title company it appears that this is probably
18  the Jimmy Connors, thing --
19          THE WITNESS: Yes, it is.
20          MR. STANZIALE: -- where it says number
21  two, "Construction Lien Claim Recorded."
22      A.   That's what it was. The total amount of
23  the bill was 25. He got a lien for that because he
24  was almost done. He still had to sand the floors and
25  stain them.

---

12 (Pages 42 to 45)

S. Kleinschmidt - direct

46

1  Q.  Okay.
2  A.  So we ended up settling for, like, 23
3  and change. Just so you know, Terri.
4  Q.  Okay. Thank you.
5     As far as you know, Howard Pfeffer,
6  however, was never paid?
7  A.  No, he was eventually paid because I
8  received in information from Doug Sclar saying that
9  Victoria Brown never sent him the money.
10  Q.  I apologize. Victoria Brown never paid
11  Howard Pfeffer.
12  A.  That's what I remember.
13  Q.  Okay.
14  A.  And then he was -- I think he was sent
15  the money -- that's what happened. The money was
16  actually sent to the title company. She never paid
17  him. The money sat in escrow, and then when the
18  escrow was released, that money had to be paid. So
19  Doug Sclar ended up making the payment; and the title
20  company, the woman from Morristown came over and
21  picked up the check from Doug Sclar's office, and it
22  was 500 and some dollars by then.
23  Q.  How about the Seminaras?
24  A.  And the Seminaras had a complaint for
25  $88,892.96, and they agreed to settle for $80,000,

47

1  which we have, you should have the copies of that
2  paperwork. Do you have that?
3  Q.  I do not.
4  A.  I don't know where all this paperwork
5  went.
6  Q.  Me, either.
7  A.  I'm very concerned about where all these
8  papers went that were turned in.
9  Q.  I'm thinking that there's another file
10  that somehow we didn't get from Mr. Wolff.
11  A.  I'm very concerned right now.
12  Q.  Did the Seminaras put the mortgage on
13  the property?
14  A.  No, I would have had eight months until
15  April 22nd. I filed on the 13th of February.
16  Q.  I'm reading this very, very quickly. So
17  it was $80,000, $20,000 to be paid on or before
18  August 22nd. Was that payment made?
19  A.  Yeah, it was paid retroactively. They
20  wouldn't release a warrant of satisfaction, unless it
21  was paid from the money from the proceeds that were
22  escrowed.
23  Q.  Okay. But that was paid?
24  A.  Yes, it was.
25  Q.  Then an additional payment of $60,000

48

1  was to be made on or before February 22nd?
2  A.  Correct. And then there was two months
3  additional there you see to April 22nd or I would be
4  in default.
5  Q.  To give you a cure period?
6  A.  And then I would have another seven
7  percent that would be due and payable if I didn't
8  meet that time frame.
9  Q.  But then it says, "To secure payment of
10  the remaining $60,00 defendant has agreed to pay the
11  following: Allstate form mortgage and note in the
12  principal amount of $60,000 with an interest rate of
13  seven percent."
14     Was that mortgage ever put on the
15  property?
16  A.  No.
17  Q.  Okay. And that was not put on the
18  property because they would have had to wait until
19  after April 22nd in order to put the mortgage on the
20  property?
21  A.  Correct.
22  Q.  Okay.
23  A.  He was also paid another $4,000
24  additional to that that I had paid him, which I have
25  a receipt.

49

1  Q.  I'm sorry. You paid him an additional
2  $4,000?
3  A.  Prior to them filing that complaint
4  against me.
5  Q.  Why did you owe the Seminaras money?
6  A.  They lent me two different sums of
7  money, one was $30,000 and one for $35,000.
8  Q.  And they lent you that money why?
9  A.  Because I needed money personally just
10  overall to take care of things because real estate
11  wasn't selling.
12  Q.  They were friends of yours?
13  A.  I actually built them a house. And I
14  built them a house start to finish in about
15  four-and-a-half months, and they were very, very
16  happy. I sold their house that they were living in.
17  And you know, we just had a good relationship.
18  Q.  So you --
19  A.  They saw my work and they wanted me to
20  build them a home, so we did. So they had a great
21  experience doing that. And you know, we became
22  friendly. And I told them I had a need, and they
23  said, okay, fine. We set up an interest, you know,
24  return for them that was good. And unfortunately,
25  things for me never got better with anything for all

13 (Pages 46 to 49)

S. Kleinschmidt - direct

---

50

1  the money to pay them, and so then they filed a
2  Complaint.
3       MS. FREEDMAN: Ben, I'm going to give
4  this back to you because I don't want you to lose
5  your copy of it, but I would like to get a copy of
6  that.
7       MR. STANZIALE: I'll recopy everything
8  and send it to you so this way you don't have that
9  issue.
10      MS. FREEDMAN: If you want, you can just
11 scan it to me.
12      MR. STANZIALE: It will be too big.
13      MS. FREEDMAN: Too big?
14      MR. STANZIALE: Everything.
15      MS. FREEDMAN: I'm trying to save you
16 the cost of the paper.
17   Q.   Okay. So that takes care of discussing
18 Seminara.
19      Wickes Lumber is next and we discussed
20 that one.
21      General Title Company escrow, $6,000.
22 Do you know what that was for?
23   A.   They wanted above and beyond for the two
24 accounts, one for Wickes and one for Seminara, or
25 whatever the main three besides Pfeffer. They wanted

---

51

1  above and beyond percentage-wise. This gentleman
2  Larry on the conversation of the closing that
3  evening, he asked for extra moneys because they
4  usually put an extra percentage on the amount that's
5  escrowed. They want to back themselves up.
6    Q.   Was that money ultimately released back
7  to you?
8    A.   Yes, it was. Except how it was
9  released. I think it was split, once Seminaras was
10 paid $3,000, and then Jimmy Connors $23,000. Because
11 Wickes was paid right away.
12   Q.   The next check says, "Check to borrower
13 Steven Kleinschmidt." Is that a typo?
14   A.   That's a typo.
15   Q.   So you received a check at the closing
16 for $76,874.80?
17   A.   No, I didn't. I did not receive those
18 checks. I have copies of checks that were given.
19 You want this information?
20   Q.   Yes.
21   A.   I only received two checks the night of
22 the closing, and one was for -- in fact, I think it
23 was only one check. It was for $9,000 and change.
24 Right here. Okay?
25      Then on another date, which I have all

---

52

1  my records, okay, the $67,000 check. Okay?
2    Q.   Um-hum.
3    A.   Was given to me afterwards because these
4  releases had to be met with the title company.
5    Q.   The check for $67,000 was dated on
6  August 4th.
7    A.   Okay. So then this check I got, and
8  this check I got on the 4th.
9    Q.   So $67,000 you received on the 4th?
10   A.   Okay.
11   Q.   And 98 -- I need to be clear for the
12 reporter. She doesn't know what we're talking about.
13 So check number 285 for $67,000 you received on the
14 4th; and check number 284 for $9,874.80 you received
15 on the 4th, as well?
16   A.   Correct. The other two amounts I had to
17 wait until these releases were satisfied from the
18 title company. There were two other checks there.
19   Q.   And just for the record, all of these,
20 all of these checks and the total moneys received
21 from Mark Gordon at the closing are listed on T-1.
22      MR. STANZIALE: Is that right? Is that
23 what was received?
24   A.   If that check is dated, I don't know.
25 You're telling me it's dated the 4th.

---

53

1    Q.   I will be happy to show you a copy of
2  it.
3    A.   Okay. If it's dated the 4th, it is. So
4  those were the only two checks I received the day of
5  the closing. You have the copies of the other
6  checks, too, obviously, 78,170.23 and 71,852.96.
7  Those have the different dates, yeah. I put them
8  here. All right? So those were the totals, yes.
9    Q.   You received another check on August
10 18th?
11   A.   And the 21st. Right.
12   Q.   And you received a check on the 21st?
13   A.   Right. So these two are the other
14 checks. Those are the only four checks I received
15 from that closing, which was a total of $226,897.99.
16   Q.   This is the second page of T-1. And is
17 this a document that you typed up and prepared?
18   A.   Um-hum. Yes, it is.
19   Q.   So let's just talk about what this
20 document means.
21      At the top it says, "Chase Checking &
22 Savings Account Information."
23   A.   Right.
24   Q.   "Statements will support that
25 $145,170.23 was deposited in a checking account

---

14 (Pages 50 to 53)

S. Kleinschmidt - direct

### 54

1  ending in 4345, and another $71,852.96 was deposited
2  in savings account 3471."
3       A.    If you add those three figures up,
4  that's the 226 total amount of moneys I received from
5  the closing. I opened up a separate account to start
6  this off with.
7       Q.    But that was only two amounts, and those
8  two amounts total $217,034.32?
9       A.    Um-hum. I received $9,000. You have a
10  check for $9,000 and change at the closing. That
11  will prove out to the $226,000 that I referred to
12  there.
13      Q.    Is that $9,874.80? It must be.
14      A.    Yes, um-hum. So if you add those two
15  numbers. So I ended up a separate checking account
16  so I could track all these funds.
17      Q.    How many checking accounts do you have?
18           MR. STANZIALE: Now or then?
19           MS. FREEDMAN: Then. I'm sorry, then.
20      A.    I had two. I had one for personal in TD
21  Bank, and then I have that one that I opened up for
22  this transaction so I could document all the funds.
23      Q.    Take a step back a second because the
24  court reporter doesn't understand what you're
25  referring to.

### 55

1           Does the checking account ending in
2  4345, that's a Chase account?
3       A.    Right.
4       Q.    Is that the one that you're referring to
5  that you opened up?
6       A.    I opened up separately just for this
7  transaction for the second mortgage for Mark Gordon,
8  yes.
9       Q.    Okay. And what about the account ending
10  in 3471?
11      A.    That was a savings account opened up for
12  the same amount. That money is from this closing
13  went into that account.
14      Q.    Okay. And the 3471 account you would
15  draw moneys out of and put them in your checking
16  account as needed?
17      A.    Yes, because I used the money in the
18  checking account first. I'm not going to be stupid,
19  I want to make interest on the money.
20      Q.    Yes.
21      A.    So I have it in a savings account.
22      Q.    Yes.
23      A.    And then when the money from the
24  checking account was depleted for using it for the
25  house, then the money was transferred to the checking

### 56

1  account.
2       Q.    Did you use the money from the closing
3  for anything other than just payments toward
4  construction of the house?
5       A.    Yes, I stated that. Just to keep afloat
6  paying bills, so some money was used, yeah.
7       Q.    Did Mark Gordon know that you intended
8  to use that money to live off of, or did he believe
9  that the money was only to be used towards completion
10  of the house?
11      A.    I would assume he would believe the
12  money was going to go for the house; but right from
13  the closing, like I just told you, I don't have
14  enough money to finish the home. I did not receive
15  $350,000.
16      Q.    No, I understand.
17      A.    And you can also see it deposited -- I'm
18  sorry. Go ahead.
19      Q.    I understand. And I know that you can't
20  read Mr. Gordon's mind, and I will be speaking to him
21  next week. But is it your understanding that he knew
22  that you were going to use proceeds from his loan for
23  your personal use?
24      A.    I don't think so. I borrowed the money
25  to finish the house.

### 57

1       Q.    Okay. But you did use proceeds from the
2  loan for your personal use. Correct?
3       A.    Yes, which I stated clearly in the
4  documents I submitted to the Court.
5       Q.    And I'm not disputing that. I just want
6  to understand the transaction.
7       A.    Um-hum.
8       Q.    I notice that some of the checks that
9  were cut at the closing were cut from Mr. Gordon's
10  account.
11      A.    Correct.
12      Q.    And some of the checks were cut from
13  Victoria Brown's account?
14      A.    Correct. So that's --
15      Q.    Can you explain that to me?
16      A.    I don't have any idea. That's what I
17  was given and that's the way they decided to do it.
18  So if it's not interest, the way the joint venture
19  was going to read, he's giving me a check personally.
20  Obviously that's a problem.
21           MR. STANZIALE: The T-1, I believe,
22  explains that. It says checks paid from Gordon's
23  account. See?
24           THE WITNESS: Right.
25           MR. STANZIALE: Mark Gordon's account.

15 (Pages 54 to 57)

S. Kleinschmidt - direct

58

1    MS. FREEDMAN:  Oh, it definitely says
2 that some came from Gordon and some came from
3 Victoria, but I don't know why, because they were cut
4 on the same day from two different accounts.  Why
5 wasn't all the money in Victoria Brown's account for
6 her to cut as the attorney?
7    MR. STANZIALE:  Well, I think he said
8 before that he didn't show up with all the money, or
9 something to that effect, so probably Victoria didn't
10 have any in her trust account, so he wrote it
11 directly.
12    MS. FREEDMAN:  But they're all from the
13 same day.
14    MR. STANZIALE:  That's what I'm saying,
15 that he didn't have it in the trust account as a
16 certified check, so he probably gave him a regular
17 check.
18    MS. FREEDMAN:  So for example, he cut
19 the correct directly to his girlfriend.
20    A.    So this obviously --
21    MS. FREEDMAN:  I'm just wondering.
22    Q.    Now, you paid off some of your creditors
23 with the proceeds from the Gordon loan as we
24 discussed.  The creditors that got paid -- let me
25 back up for a second.  Let me rephrase that.

59

1    Did you only pay those creditors that
2 had judgments against you?
3    A.    Absolutely not.
4    Q.    Who did you decide who to pay with
5 proceeds from the Gordon loan?
6    A.    I paid everything that had to be paid in
7 order, in priority order.
8    Q.    Repeat that?
9    A.    I paid everything in priority that
10 needed to be paid.  I had existing bills that needed
11 to be paid right off the bat when we borrowed the
12 money.  He saw it was to people that had to be paid.
13 Those were already existing bills.
14    Q.    Existing bills that were?
15    A.    To contractors.
16    Q.    To contractors?
17    A.    Right.
18    Q.    And those existing -- those creditor --
19 there's a certain group of creditors that had
20 judgments and certain group of creditors that did not
21 have judgments.
22    A.    The only people who had judgments are on
23 that paperwork.
24    Q.    Okay.
25    A.    No one else.

60

1    Q.    Is there a third mortgage on the
2 property?
3    A.    No, there isn't.
4    Q.    Do you have anything more to add about
5 the transaction other than what we discussed?
6    A.    No.
7    Q.    Have you now told us everything that you
8 recall about your dealings with Mr. Gordon?
9    A.    Everything you're asking me.  And I
10 think the papers submitted are very self-explanatory
11 where the funds went.  All the papers that were
12 turned in.  You need to review some of them still.
13    Q.    I do need to review some of the
14 transactional documents.
15    Okay.  Who is Jeffrey Lewis?
16    A.    Jeffrey Lewis is a party who lent me
17 $16,500.
18    Q.    Have you repaid Mr. Lewis?
19    A.    Yes, he was paid.
20    Q.    From what fund was he used?
21    A.    Out of these proceeds, because he had
22 given us money towards the cost of building this
23 house, so that was part of an outstanding debt from
24 the bills.
25    Q.    Who is Emanuel Akpan?  Am I saying his

61

1 name correctly?
2    A.    Emanuel Akpan.
3    Q.    Okay?
4    A.    He is somebody that I knew from church.
5    Q.    Is he a friend?
6    A.    Um-hum.
7    Q.    Do you owe him money?
8    A.    No.
9    Q.    I know that his name came up at your
10 341, but I wasn't there so I don't know why Mr. Wolff
11 had asked you that.
12    A.    Okay.  Mr. Akpan had a complaint against
13 me.  I helped him build a building, and I consulted
14 him and helped him.  And I built a two-story
15 commercial building for him.  And at the end he
16 refused to pay us the rest of the money that was
17 owed.  So Mr. Sclar handled that, also.  So he filed
18 a counter complaint which was a bogus nature.  Since
19 then has ceased and desist with that complaint.
20    Q.    Does Mr. Akpan still owe you money?
21    A.    Technically, but I don't know, you know,
22 what's going to happen there.  Because that was DSK
23 Property and DSK Property is a defunct company now.
24 It's closed.
25    Q.    Okay.  But Mr. Akpan owes DSK Properties

16 (Pages 58 to 61)

S. Kleinschmidt - direct

---

**62**

1  some sum of money. What is that sum of money?
2     A.   It was $9,500 that was -- is it $9,500?
3        MR. STANZIALE: I believe so.
4     Q.   And he wanted to split that amount.
5     Q.   Who wanted to split that amount?
6     A.   Mr. Akpan.
7     Q.   So he wanted to pay you basically five
8  grand, $4,500, somewhere around there?
9     A.   Right.
10    Q.   So settle what he owed you?
11    A.   Right.
12    Q.   And what happened to that proposal?
13    A.   Because everything around that with my
14 paperwork being in bankruptcy and DSK Properties
15 being closed, the money is frozen.
16    Q.   The money is frozen where?
17    A.   It's in Doug Sclar's trust account.
18    Q.   So these are the funds -- is Doug Sclar
19 holding any other funds for you?
20    A.   Absolutely not.
21    Q.   So do you know what the exact amount is?
22    A.   I think it's $9,400.
23       MR. STANZIALE: Yeah, 94 or 9,500.
24    A.   And change.
25    Q.   And was it Mr. Akpan's proposal that

---

**63**

1  Mr. Sclar should turn money back over to him?
2     A.   Um-hum.
3     Q.   But Mr. Akpan had given Doug Sclar the
4  $9,400?
5     A.   The Court awarded it to us.
6     Q.   Okay. So let me take a step back.
7     A.   Yes.
8     Q.   You file a lawsuit against -- how do you
9  spell his name, so I'm saying it correctly.
10    A.   Akpan, A-K-P-A-N. But it was Emanse
11 Estate LLC that filed the complaint. That was his
12 entity.
13    Q.   So a complaint was filed by DSK
14 Properties against Emanse Estate?
15    A.   Initially.
16    Q.   Okay. And in that complaint there were
17 claims that Emanse Estate owed DSK Properties $9,500?
18    A.   No, it was more than that.
19    Q.   Okay.
20    A.   It was $18,000 and change which was
21 found out to be obviously that's not the case, the
22 judge did not award that.
23    Q.   Okay.
24    A.   I think he awarded $8,400 plus ten
25 personal interest.

---

**64**

1        MR. STANZIALE: I have a copy of the
2  order from the Court if you want to look at that.
3        MS. FREEDMAN: Thank you. This I would
4  like a copy of because I'm going to be giving
5  Mr. Sclar a call.
6        MS. FREEDMAN: I believe Mr. Wolff
7  spoke with Mr. Sclar.
8        MS. FREEDMAN: He did. I'm just trying
9  to understand because this complaint is Emanse Estate
10 versus DSK, so they went after DSK.
11    A.   He filed a bogus counterclaim.
12    Q.   Well, it's not a counterclaim. This
13 would be a complaint. He filed a complaint against
14 DSK. You guys filed a counterclaim.
15    A.   Well, he filed a complaint against me,
16 but it was in retaliation to when I --
17    Q.   Let me finish.
18    A.   Sorry.
19    Q.   You guys filed a counterclaim against
20 him?
21    A.   We initiated the claim first to get
22 moneys. Then he filed a claim against us. I don't
23 know what the date.
24       MR. STANZIALE: Well, this has Emanse as
25 the plaintiff. Were there two cases?

---

**65**

1        THE WITNESS: Yeah, because I filed one
2  against him. I think what happened was Doug Sclar
3  did a letter to him and did something in civil court.
4  Okay?
5     Q.   According to this order, the plaintiff
6  received over $20,000.
7     A.   No, there was $30,000 in escrow
8  initially because he refinanced his building. He
9  owed me money. The title company called me and said
10 we're going to give you a check because we aren't
11 going to allow him to refinance the building unless
12 he pays you, because I put a mechanic's lien on the
13 property for 18 and a half thousand dollars.
14       When they went to court, okay, it was --
15 I guess they came to a place of where the Court said
16 there was only X amount of dollars owed, which was
17 8,400. So they allowed him to take $20,000 of that
18 escrowed money.
19    Q.   Okay.
20    A.   You know? And --
21    Q.   Okay.
22       MS. FREEDMAN: May I get a copy of this
23 order, too?
24       MR. STANZIALE: Actually, you can keep
25 that one.

---

17 (Pages 62 to 65)

S. Kleinschmidt - direct

```
                                          66
1        MS. FREEDMAN:  Thank you.
2    Q.    At the beginning of the deposition, we
3    talked about DSK Properties and you told me that DSK
4    never owned any properties.  Did they do any
5    business?
6    A.    We did some business.  You know, that
7    was the one place that we did really business.  Then
8    we did a couple of basements in a couple of years.
9    That was it.  There was nothing anything.  The
10   biggest project that I did, I was a consultant for
11   Emanse Estate.  He hired all the contractors.  I was
12   a site supervisor.  That's all.  The weekly fee.
13   Q.    Is that how the money came to be owed to
14   DSK by Emanse Estate?
15   A.    Yes.
16   Q.    You were hired as a site supervisor?
17   A.    Yes.
18   Q.    Who was Max Granados?
19   A.    He's a friend of a friend who lent money
20   to me for the project that I was doing, too.
21   Q.    Which project?
22   A.    Building the house at 318 Center Grove
23   Road.
24   Q.    Okay.  So he lent money on 318 Center
25   Grove Road?
```

```
                                          67
1    A.    Right.
2    Q.    Did he ever take a mortgage?
3    A.    No.
4    Q.    Unsecured loan?
5    A.    Yes, it was.
6    Q.    And how much money did he lend to you?
7    A.    Twenty-five thousand dollars, and I paid
8    him $5,000.
9    Q.    Are you aware that he filed a complaint
10   in your bankruptcy for fraud?
11   A.    No.
12       MR. STANZIALE:  Have you been served
13   with it?
14       THE WITNESS:  No.
15       MS. FREEDMAN:  Just so you know, it's on
16   the docket, a complaint for nondischargeability type
17   complaint was filed last week.  I believe that the
18   amount he sued for was $40,000.
19   A.    There's no fraud.  He lent me the money.
20   I was supposed to sell the house when it was
21   completed.
22       MR. STANZIALE:  There's no question
23   pending.
24   Q.    So Doug Sclar was your attorney who
25   represented you in connection with various real
```

```
                                          68
1    estate transactions?
2    A.    No, just these complaints.  You know, as
3    things started to slide downwards with finances, you
4    know, I had some complaints here, and Doug handled
5    them for me and my wife.
6    Q.    So he was your defense attorney
7    essentially on these complaints?
8    A.    Yes, that's it.
9    Q.    And if I asked you this previously, I
10   apologize.  Is he holding any other moneys for you?
11   A.    No, he isn't.
12   Q.    Just the $9,400?
13   A.    Nothing for me personally or DSK
14   Properties.
15   Q.    Now, when you say DSK Properties is
16   dormant, have you actually wound down the corporation
17   in a legal sense?
18   A.    It's closed.  I mean, yeah, there's
19   nothing happening there.  No checking account.
20   Q.    Why would you think that the $9,400
21   could not be received by DSK Properties?
22   A.    It's not $9,400, it's $4,500.
23       MR. STANZIALE:  It's part of the
24   settlement is what he's talking about.
25   A.    And that came after the fact of when I
```

```
                                          69
1    filed.
2    Q.    The settlement came about after you
3    filed?
4    A.    That's correct.
5    Q.    I saw in some of the paperwork that I
6    did receive that you are a member of a church.
7    A.    Yes.
8    Q.    Okay.  And that you've received funds
9    from various members of the church.  Is that correct?
10   A.    Yes, to help my wife and I out.
11   Q.    How much money have members of the
12   church given you post petition?
13   A.    I don't know.  I made a copy of the
14   checks that were given.
15   Q.    Are they still assisting you?
16   A.    No.
17   Q.    Were those moneys loans that you intend
18   to repay or were they gifts?
19   A.    The one for $5,000 is supposed to be
20   paid back.  It wasn't anything agreed to and it was
21   an open thing.  I mean, the right thing to do would
22   be to try to pay them back, but they have not asked
23   my wife and I for the money.  They never disclosed it
24   was a loan.
25   Q.    Did members of the church give you loans
```

18 (Pages 66 to 69)

S. Kleinschmidt - direct

**70**

1  prepetition as well?
2      A.    No.
3      Q.    Just post petition?
4      A.    No. We had a very hard time, you know.
5  I made them aware of things because we're very open.
6      Q.    So just since the filing?
7      A.    Right, before the filing.
8      Q.    Before the filing?
9      A.    Those checks are before the filing, I
10  believe you're referring to.
11      Q.    That's what I just asked you. Did
12  people give you funds before the filing?
13      A.    Yes, because we were having hard times,
14  yes.
15      Q.    Did they give you funds after the
16  filing?
17      A.    No.
18      Q.    Did you list any of those individuals as
19  creditors?
20      A.    No, I didn't. All of those amounts I
21  think if you looked at them were small checks, $300,
22  $600. There was only one large check there, I think,
23  for $5,000.
24      Q.    Yes. I saw a couple of checks for small
25  amounts and maybe one bigger one. Are those the only

**71**

1  checks that you have received?
2      A.    Yes.
3      Q.    Okay. Your tax returns. The last one
4  that I saw was from 2005.
5      A.    Correct.
6      Q.    How come you haven't filed a tax return
7  since 2005?
8      A.    I filed extensions. And as far as being
9  in the negative, okay, then obviously we didn't have
10  any money coming back. And as far as being in the
11  negative, we got a return of 13, $1,400. Our
12  accountant held us under the wire for doing our
13  returns, okay, for moneys. The one return for '05,
14  DSK Properties and our personal, he wanted to charge
15  us $3,500. I still owe him money. And he refused to
16  do the '06 and '07 return until I pay him.
17      Q.    Is he listed as a creditor?
18      A.    No. So after talking to counsel, we
19  decided not to because I needed services; but at this
20  point, I need to finalize 2006, 2007, which we have
21  all the information for, but we have an issue with
22  paying.
23      Q.    How about 2008?
24      A.    2008 there was an extension filed.
25      Q.    But you will need to deal with that.

**72**

1      A.    Sure. I want to. We had all the
2  paperwork. It's just a matter of having him. I'll
3  take care of it right now.
4      Q.    At your 341, I know the operating
5  agreement for DSK Contractors was requested. I don't
6  know if it was ever received by Mr. Wolff, so I want
7  to make a request for that document, please?
8          THE WITNESS: I know that I gave it to
9  you.
10          MR. STANZIALE: I'll double check.
11          MS. FREEDMAN: Okay.
12      Q.    Mr. Wolff had also requested that
13  amended Schedules I and J were filed. Do you know if
14  they were filed?
15          MR. STANZIALE: No, I did not do that
16  yet. I'll do it.
17      Q.    I noted on the docket that a motion for
18  relief from stay was filed by one of the banks.
19          MR. STANZIALE: HSBC.
20      Q.    Will you be opposing that motion?
21          MR. STANZIALE: That's something that I
22  need to discuss with my client as to what we're
23  doing.
24          MS. FREEDMAN: I just have a few more
25  general questions.

**73**

1      Q.    Did you meet with your attorney before
2  this deposition?
3      A.    I talked to him on the phone.
4      Q.    How many times did you talk to him about
5  this deposition?
6      A.    I don't know. Like, maybe two times
7  maybe.
8      Q.    Do you keep a file or maintain any
9  documents in connection with the loan from Mark
10  Gordon or from any of the other transactions that
11  have been the subject of your bankruptcy that you
12  have not turned over?
13      A.    Absolutely not, no. Everything that was
14  requested was turned over. Everything I have, you
15  know.
16      Q.    Okay. Did you review any documents
17  prior to coming here today to refresh your
18  recollection?
19      A.    No.
20      Q.    Did you talk to anybody else about the
21  deposition?
22      A.    No.
23      Q.    Did you discuss it with your wife?
24      A.    Just that we had to come -- I had to
25  come. That's it. And I asked her to Google the

19 (Pages 70 to 73)

S. Kleinschmidt - cross

|  | 74 |
|---|---|
| 1 | directions to your office. That's about it. |
| 2 | MS. FREEDMAN: That's all I have for |
| 3 | right now. |
| 4 | Do you want to take a break? |
| 5 | MR. STANZIALE: Do you mind if we take a |
| 6 | break just briefly? |
| 7 | (A recess is taken.) |
| 8 | CROSS-EXAMINATION BY MS. KANG: |
| 9 | Q.    My name is Una Kang, and I'm counsel for |
| 10 | Robert Bennan, RHB Realty LLC. |
| 11 | A.    Okay. |
| 12 | Q.    Craig and Kerry Seminara? |
| 13 | A.    Right. |
| 14 | Q.    And Michael Ruppe. |
| 15 | A.    Okay. |
| 16 | Q.    And I will be asking just a few |
| 17 | follow-up questions, so we won't be here too much |
| 18 | longer. |
| 19 | A.    Okay. |
| 20 | Q.    And I apologize for jumping around, but |
| 21 | Terri took a lot of the questions I had. |
| 22 | MS. FREEDMAN: Sorry. |
| 23 | A.    That's a help. Right? |
| 24 | Q.    Yes. So we've narrowed it down a lot, |
| 25 | but I may have to jump around a little bit, and for |

|  | 76 |
|---|---|
| 1 | to be in this program? |
| 2 | A.    You have to pay $49 a month to pay your |
| 3 | hosting fee for the website that they supply, so |
| 4 | people can book travel on the main company website. |
| 5 | That's how it works. |
| 6 | Q.    Okay. And then so you pay a fee to be |
| 7 | in this program. Do you get any percentage or a |
| 8 | commission from sales from the website, or how |
| 9 | basically what benefit is there for you to |
| 10 | participate? |
| 11 | A.    Yes, you get a percentage of whatever |
| 12 | travel that's booked. |
| 13 | Q.    Okay. |
| 14 | A.    Yeah. |
| 15 | Q.    And do you know just off the top of your |
| 16 | head, I did see some documents that you had produced, |
| 17 | but do you recall how much you've gotten in terms of, |
| 18 | you know, those commission payments as a result of |
| 19 | sales through your website? |
| 20 | A.    Over the last year and a half I think |
| 21 | we've made about $2,200, $2,100. |
| 22 | Q.    Okay. And how long have you |
| 23 | participated in the program? |
| 24 | A.    October of '07 is when we got involved. |
| 25 | Q.    Do you know how much you've made total |

|  | 75 |
|---|---|
| 1 | that I apologize. |
| 2 | A.    Okay. |
| 3 | Q.    I just want to confirm that other than |
| 4 | DSK Contractors and DSK Properties you don't have any |
| 5 | other interest in any other businesses or entities. |
| 6 | A.    No, I don't. |
| 7 | Q.    Is that correct? |
| 8 | THE WITNESS: Is that correct? |
| 9 | MR. STANZIALE: How about the 4 You |
| 10 | Travel, or something? |
| 11 | A.    Oh, Escape Travel 4 You. It's YTP |
| 12 | Travel Networking Cruises is the main company, and |
| 13 | you come in there. It's something that you join. |
| 14 | You get benefits if you want to travel; and you can, |
| 15 | you know, have people join the company and build the |
| 16 | company, too. So it's a multi-level marketing kind |
| 17 | of thing. |
| 18 | Q.    Okay. And you mentioned the website |
| 19 | escapetravel4you.com. Was that website created by |
| 20 | YTB Travel Network? |
| 21 | A.    No, each individual can pick their own, |
| 22 | and then you get a blanketed website that's the |
| 23 | parent company, if you will. And that's really how |
| 24 | it works. |
| 25 | Q.    Okay. And do you have to pay any fees |

|  | 77 |
|---|---|
| 1 | since that point? |
| 2 | A.    That's what I'm saying. |
| 3 | Q.    Okay. |
| 4 | A.    Since this was taken care of through our |
| 5 | hearing, at that point those documents that I |
| 6 | produced, those were accurate and up to date. |
| 7 | Q.    Okay. And people can still book on your |
| 8 | website now -- |
| 9 | A.    Yes. |
| 10 | Q.    -- if they wanted to? |
| 11 | A.    Yes, yes. If you want a card, I'll give |
| 12 | you one when we leave. I'm only kidding. |
| 13 | Q.    All right. And then I think you said |
| 14 | earlier that when we just -- okay. So you discussed |
| 15 | Mr. Dean Smith before. |
| 16 | A.    Correct. |
| 17 | Q.    And did you say that he was listed as a |
| 18 | creditor or he's not listed as a creditor? |
| 19 | A.    No. |
| 20 | Q.    He's not listed as a creditor. Okay. |
| 21 | A.    Right. |
| 22 | THE WITNESS: Oh, I'm sorry. Did we |
| 23 | name him on the paperwork, on the petition? |
| 24 | MR. STANZIALE: I don't believe so, but |
| 25 | let me look. Yes, yes, we did. |

20 (Pages 74 to 77)

S. Kleinschmidt - cross

|  | 78 |
|---|---|
| 1 | A. Sorry. |
| 2 | Q. Okay. Can you describe his claim? |
| 3 | A. Excuse me? |
| 4 | Q. Can you describe his claim? |
| 5 | A. He has no claim. We just have two lots |
| 6 | together. We are 50/50 percent owners on those two |
| 7 | lots in Chester. |
| 8 | Q. Okay. |
| 9 | A. So you know, for my purposes for Boiling |
| 10 | Springs, okay, and for DSK Contractors, through |
| 11 | counsel advice that's what we named. |
| 12 | MR. STANZIALE: Doesn't he have a |
| 13 | mortgage against those properties? |
| 14 | THE WITNESS: He does have a mortgage, |
| 15 | yes. |
| 16 | MR. STANZIALE: Okay. |
| 17 | Q. Okay. And are those two properties in |
| 18 | Chester, are those properties that are commonly known |
| 19 | as North Road? |
| 20 | A. Yes. |
| 21 | Q. What are the numbers, the addresses? |
| 22 | A. 162 and 164 North Road. |
| 23 | Q. Okay. All right. Do you have any |
| 24 | lawsuits currently pending against anyone? |
| 25 | A. No, I don't. Against anybody? No. |

|  | 79 |
|---|---|
| 1 | Q. Okay. Do any of the entities that you |
| 2 | have interests in have lawsuits pending against |
| 3 | anyone? |
| 4 | A. No. |
| 5 | Q. Okay. Have you or any of the entities |
| 6 | that we've discussed every ever made any loans to |
| 7 | anyone? |
| 8 | MR. STANZIALE: Any what? |
| 9 | Q. Any loans. |
| 10 | A. I made a loan to DSK Properties, you |
| 11 | know, for different things, but it was, like, three |
| 12 | or $4,000. |
| 13 | Q. In total? |
| 14 | A. For different things, yeah. |
| 15 | MR. STANZIALE: You personally you mean? |
| 16 | A. Yeah, I put money into the, you know, |
| 17 | account like you would start something, but that was |
| 18 | back in '05, I believe. |
| 19 | Q. Okay. And then you mentioned that you |
| 20 | are currently affiliated with Real Estate |
| 21 | Consultants? |
| 22 | A. Yes. |
| 23 | Q. You and your wife? |
| 24 | A. Yes. |
| 25 | Q. What was Renown Realty? |

|  | 80 |
|---|---|
| 1 | A. Re/Max Renown is the prior office that I |
| 2 | worked at. I was with Re/Max for probably six years. |
| 3 | I have a 21-year career in real estate, so I worked |
| 4 | for a number of brokers. In the process of our |
| 5 | finances deteriorating because of real estate sales |
| 6 | and building, we chose to go to Real Estate |
| 7 | Consultants because there's no monthly overhead, no |
| 8 | fee, so it was a way to reduce our liabilities |
| 9 | monthly. |
| 10 | Q. Okay. Do you or your wife currently |
| 11 | have any listings through Real Estate Consultants? |
| 12 | A. Only the two lots in Chester. That's |
| 13 | all we have listed. We have no pending sales, and |
| 14 | this is why I had to take a job. |
| 15 | Q. I understand. Have you ever made any |
| 16 | commissions through Real Estate Consultants? |
| 17 | A. Never got paid a commission. I went |
| 18 | there on November 25th of '08 is when we moved. |
| 19 | Q. Okay. For this settlement with Wickes |
| 20 | Lumber, did you sign a settlement agreement? |
| 21 | A. There was a settlement agreement and a |
| 22 | warrant of satisfaction that was issued through Doug |
| 23 | Sclar who represented me. |
| 24 | Q. Was that -- did you produce those |
| 25 | documents? |

|  | 81 |
|---|---|
| 1 | A. That I don't recall. I know that we -- |
| 2 | I don't know. |
| 3 | MR. STANZIALE: I don't think that was. |
| 4 | A. But they're available. |
| 5 | Q. Okay. Thank you. |
| 6 | A. Otherwise I wouldn't have gotten any |
| 7 | money from the title company. |
| 8 | Q. Okay. Going back to Mr. Gordon's |
| 9 | mortgage on the 318 Center Grove property. |
| 10 | A. Yes. |
| 11 | Q. Did he -- I notice on the HUD statement |
| 12 | there were lines that indicated the amounts of the |
| 13 | different judgments that were on the property. Do |
| 14 | you know if Mr. Gordon expected or intended the |
| 15 | moneys that he provided and were held in escrow to |
| 16 | satisfy all of those judgments? |
| 17 | A. Yes, that was part of being able to |
| 18 | close. |
| 19 | Q. Okay. Do you know if by satisfy -- do |
| 20 | you know -- sorry. |
| 21 | MR. STANZIALE: I don't think he |
| 22 | understood your question. |
| 23 | THE WITNESS: Okay. |
| 24 | MR. STANZIALE: So I think you really |
| 25 | should ask it again, because I think contemplated in |

21 (Pages 78 to 81)

S. Kleinschmidt - cross

82

1  this agreement with the title company were
2  settlements with those judgment holders. So they
3  weren't going to be paid in full, unless he's going
4  to testify differently, but I believe this says there
5  was going to be settlements with them.
6      A.    Ask the question again? I'm sorry.
7      Q.    Okay. So was it your understanding that
8  Mr. Gordon did not intend the amounts that were
9  placed in the escrow account to satisfy the entire
10  amounts of all of the different judgments that were
11  listed on the HUD statement? For example, the amount
12  listed for the Seminara judgment was, you know,
13  around the neighborhood of like $80,000 or $90,000.
14  Do you know if he intended from the moneys that he
15  provided as part of that transaction, if he intended
16  or expected that entire claim to be paid in full, to
17  be completely satisfied, as opposed to having some
18  sort of settlement agreement?
19      A.    I don't think he expected the whole
20  thing to be paid out of that money. Neither did I.
21  And then as a result it wasn't.
22      Q.    Okay. And so the Seminaras ended up
23  getting $20,000 as the first portion under that
24  settlement agreement you made with them. Correct?
25      A.    Prior to the $4,000 I gave them already,

83

1  yes.
2      Q.    Right. Okay.
3           Can you describe how that settlement
4  agreement with the Seminaras arose?
5      A.    Completely designed and discussed from
6  my attorney Doug Sclar to Mr. Perrucci. I had no
7  conversation with the Seminaras.
8      Q.    So they -- so did your attorney Doug
9  Sclar ask you any input, or he just --
10      A.    He basically handled it. He handled the
11  negotiations.
12      Q.    Okay. Did you direct him to settle the
13  case with the Seminaras?
14      A.    No. Whatever took place with
15  Mr. Perrucci with him is what he advised me of, and
16  things ended up being able to be settled. And the
17  manner that they were settled was the agreement
18  that's docketed, that's on file.
19      Q.    Okay. Do you know if the Seminaras were
20  aware that the full amount of their claim of the
21  judgment on the property could have been satisfied
22  from the funds in the escrow?
23      MR. STANZIALE: Does he know if they
24  knew? Is that the question?
25      Q.    To your understanding, did the

84

1  Seminaras -- were the Seminaras ever aware that there
2  was enough money as part of the transaction with
3  Mr. Gordon that their claim could have been satisfied
4  in full?
5      A.    I don't know. They had an attorney
6  represent them.
7      Q.    When did you say that you filed your
8  bankruptcy petition?
9      A.    It was February 13th, this year.
10      Q.    Okay. When did you first consider or
11  contemplate filing for bankruptcy?
12      A.    I went to see counsel prior to
13  Christmas.
14      Q.    And who was your counsel?
15      A.    I spoke to a couple of attorneys.
16      Q.    Okay. And --
17      A.    Then my wife and I ended up talking to
18  Ben.
19      Q.    Okay. And why did you consider filing
20  for bankruptcy?
21      A.    I didn't. I wanted to get my financial
22  situation evaluated by professionals.
23      Q.    Okay. And did that happen?
24      A.    Yes.
25      Q.    And did they recommend that you file for

85

1  bankruptcy?
2      A.    Yes.
3      Q.    Okay. You testified earlier that some
4  of the proceeds that you received from the mortgage
5  transaction with Mr. Gordon were applied to personal
6  bills as opposed to, you know, construction of the
7  property at 318 Center Grove. Correct?
8      A.    Some moneys.
9      Q.    Do you happen to know how much of the
10  260,000 roughly that you received from the mortgage?
11      A.    Could you just repeat that?
12      Q.    Sure. Of the total amount that you
13  received from that transaction, do you remember how
14  much of that was applied to personal bills as opposed
15  to construction on the house?
16      A.    Without paperwork in front of me, I
17  don't remember.
18      Q.    Okay. Do you know someone by the name
19  of Robert Berman?
20      A.    Yes, I do.
21      Q.    And how do you know Mr. Berman?
22      A.    I know Robert Berman for probably 15, 20
23  years.
24      Q.    And how did you first meet Mr. Berman?
25      A.    Through real estate.

22 (Pages 82 to 85)

S. Kleinschmidt - cross

86

1    Q.    Okay. And what does Mr. Berman do?
2    A.    He owns an auto body repair shop in
3    Rockaway, New Jersey.
4    Q.    Okay. And are you familiar with an
5    entity named RHB Realty?
6    A.    Yes, I am.
7    Q.    And can you describe what that entity
8    is?
9    A.    DSK Contractors and RHB Realty entered
10   into a joint venture agreement to build out one of
11   the lots over in Chester commonly known as 164 North
12   Road, Lot 76.01.
13   Q.    And whose idea was this joint venture?
14   A.    Dean Smith, myself, and Robert Berman,
15   who is the sole proprietor of RHB Realty.
16   Q.    Okay. And was Mr. Smith acquainted with
17   Mr. Berman, as well?
18   A.    Absolutely. We all had meetings and
19   met, and obtained attorneys to put together a joint
20   venture agreement and go forth and have a joint
21   venture to build that lot.
22   Q.    Okay. What was your understanding of
23   RHB Realty's obligations under the joint venture
24   agreement?
25   A.    Well, the joint venture agreement spells

87

1    it out. I can't go by memory.
2    Q.    Okay. Did RHB Realty ever advance to
3    you any moneys under the joint venture agreement?
4    A.    To me personally?
5    Q.    To you or to DSK.
6    A.    To me personally, no. And to DSK
7    Contractors, per the joint venture agreement only.
8    Q.    And do you know how much was provided by
9    Mr. Berman?
10   A.    $235,000.
11   Q.    And can you describe what the $235,000
12   was applied to?
13   A.    Per the joint venture agreement, it
14   spells it out.
15   Q.    Okay. Were those -- was that, was any
16   portion of that money ever used for any purpose other
17   than building on the lot commonly known as 164 North
18   Road?
19   A.    Absolutely not.
20   Q.    Do you have documentation to support
21   that?
22   A.    Yes, we do. DSK Contractors, not me. I
23   don't owe Robert Berman the money.
24   Q.    No, I'm not saying that.
25   A.    Yeah, DSK Contractors has a joint

88

1    venture with him only.
2    Q.    Do you know how many payments were
3    provided by RHB Realty?
4    A.    No, I would have to go through the
5    records to see that. For interest payments, you're
6    saying?
7         MR. STANZIALE:  Provided by or provided
8    to?
9    Q.    Provided by RHB Realty.
10   A.    Again, that would have to be researched
11   per the joint venture agreement.
12   Q.    Okay. And were all of those payments
13   made through checks by RHB Realty?
14   A.    Absolutely. From a closing, from
15   anything else, for funds disbursed was a check. All
16   traceable.
17   Q.    And do you know what bank account those
18   checks were deposited in?
19   A.    No.
20   Q.    Was it a bank account in the name of
21   DSK?
22   A.    Not that I remember. Mr. Berman, RHB
23   Realty wrote checks for a closing and for things that
24   they were responsible per the joint venture. No
25   money went into DSK Contractor's accounts that I

89

1    recall.
2    Q.    Okay. So are you saying that RHB Realty
3    made those checks directly to other parties other
4    than DSK?
5    A.    You know, I don't remember from --
6    again, I would have to, you know, research what took
7    place there exactly.
8    Q.    Okay. Do you know someone named Michael
9    Ruppe?
10        MS. FREEDMAN:  Before you go on, can I
11   ask one question because I'm unfamiliar with this
12   transaction, so I just want to ask you two questions
13   to make sure I understood it correctly.
14        THE WITNESS:  Yes.
15        MS. FREEDMAN:  RHB Realty funded
16   $235,000?
17        THE WITNESS:  DSK Contractors and to do
18   a joint venture to build that lot in Chester, yes.
19        MS. FREEDMAN:  But the lots, they're
20   vacant lots. Correct?
21        THE WITNESS:  Yeah, they were all
22   buildable, ready to go.
23        MS. FREEDMAN:  But did the 235 go toward
24   the purchase of the law land?
25        THE WITNESS:  Correct.

23 (Pages 86 to 89)

S. Kleinschmidt - redirect

90

1    MS. FREEDMAN: Okay. And the full
2    amount of 235 went toward the purchase of the raw
3    land, because there was no build-out? Nothing was
4    ever built on the land. Is that correct?
5    THE WITNESS: No, that's incorrect.
6    MS. FREEDMAN: That's incorrect? Please
7    correct that.
8    THE WITNESS: There was a foundation.
9    MS. FREEDMAN: Okay. So there was a
10    foundation there for commercial property or for
11    residential property?
12    THE WITNESS: Residential.
13    MS. FREEDMAN: It's two separate
14    properties, 162 and 164, or is it one piece of land?
15    THE WITNESS: Yes, it's separate.
16    MS. FREEDMAN: So there's two pieces.
17    What are they listed for?
18    THE WITNESS: They're listed for to
19    build the house out at a $1,275,000 if there was a
20    house to be there.
21    MS. FREEDMAN: You said there's two
22    listings. Right? Correct?
23    THE WITNESS: There's two listings.
24    MS. FREEDMAN: Okay. So one listing --
25    THE WITNESS: Both listed for houses,

91

1    for a million 275 if they were built.
2    MS. FREEDMAN: Okay, okay.
3    THE WITNESS: And in the listing, it
4    also says that if the property was interested to be
5    purchased, I believe the purchase price is $450,000
6    per lot. But that was back obviously a while ago,
7    so...
8    MR. STANZIALE: So that price is not
9    realistic is what you really want to say.
10    THE WITNESS: We owed the bank, just so
11    you know, the two lots, we owed $300,000 on one and
12    305. We purchased 475 for each lot, and the bank
13    foreclosed on us for only a $300,000 note. So we
14    lost $175 each lot.
15    MS. FREEDMAN: So the bank is
16    over-secured?
17    THE WITNESS: They wanted us to pay it
18    down further, because they're saying the lot is not
19    worth 300.
20    MS. FREEDMAN: And what was the amount
21    of the mortgage on each one? I'm sorry.
22    THE WITNESS: One was 305.
23    MS. FREEDMAN: Yes.
24    THE WITNESS: And the other one was 300
25    initially for just the land acquisition part.

92

1    MS. FREEDMAN: These are both Boiling
2    Springs?
3    THE WITNESS: Yes. There's two loans,
4    actually, $800,000 each on record because we had
5    construction loans.
6    MS. FREEDMAN: Did you draw down the
7    total amount of those loans?
8    THE WITNESS: We never started
9    construction, so we kept paying on these construction
10    loans, and the only thing that happened was we paid
11    after 18 months they wanted to, you know, take away
12    the time frame, so...
13    MS. FREEDMAN: All right. But this is
14    not as to you personally, this is only part of DSK?
15    THE WITNESS: This is DSK Contractors,
16    Dean Smith and myself being 50/50 percent.
17    MS. FREEDMAN: And no personal
18    guaranties?
19    THE WITNESS: And there was a guarantee
20    to Mr. Berman, okay, but he breached his interest
21    payments and we are in litigation with him, so...
22    MS. FREEDMAN: There's no personal
23    guaranty to Boiling Springs?
24    THE WITNESS: Well, obviously, there's
25    personal guaranties. They always make you sign

93

1    personal guaranties.
2    MS. FREEDMAN: That's why when you said
3    no at first, I looked at you, like, really?
4    MR. STANZIALE: No. In fact, they sued
5    him in the foreclosure.
6    THE WITNESS: Because we gave RHB a
7    second mortgage on that lot and the other lot to
8    secure his investment. He breached our agreement
9    with no interest payments being paid.
10    MS. FREEDMAN: Do you have any idea how
11    much those lots are worth today?
12    THE WITNESS: The bank is saying less
13    than 300 each.
14    MS. FREEDMAN: But you don't know, your
15    personal expertise?
16    THE WITNESS: I would say 300. And
17    right now -- okay.
18    MS. FREEDMAN: Has there been any
19    interest in those listings?
20    THE WITNESS: Nobody has come forward
21    for an offer or we would be ready to talk to them.
22    They would have our attention.
23    MS. FREEDMAN: Thank you.
24    Sorry.
25    MS. KANG: That's okay.

24 (Pages 90 to 93)

S. Kleinschmidt - cross

**94**

1  BY MS. KANG:
2      Q.    You said that RHB Realty never made any
3  interest payments?
4      A.    They made some.
5      Q.    All right.  Do you know someone by the
6  name of Michael Ruppe?
7      A.    Yes.
8      Q.    And how do you know Mr. Ruppe?
9      A.    Mr. Ruppe, through real estate.
10     Q.    What does Mr. Ruppe do?
11     A.    I have no idea.
12     Q.    Has Mr. Ruppe ever loaned you money?
13     A.    Five thousand dollars.
14     Q.    And that's the total amount that he's
15 ever loaned to you?
16     A.    That's right.
17     Q.    Has Mr. Ruppe ever made any gifts to
18 you?
19     A.    Yes.
20     Q.    And do you know the total amount of
21 those gifts?
22     A.    Two separate gifts for $10,000.
23     Q.    Ten thousand dollars each?
24     A.    Yes.
25     Q.    Okay.  So just to clarify --

**95**

1      A.    I believe that was 2000 and 2001.  I
2  borrowed $5,000 from him, I think it was 2004.
3      Q.    So in total comprising what you call
4  gifts and a loan, Mr. Ruppe has provided you with
5  $25,000 in total.  Correct?
6      A.    No, I borrowed $5,000.
7      Q.    Right.  So $5,000 for a loan, and two
8  payments of $10,000 each for what you're calling a
9  gift.  Correct?
10     A.    Yes.
11     Q.    Okay.  So how much money do you
12 currently owe Mr. Ruppe?
13     A.    I don't know.  Five thousand dollars
14 plus whatever interest.
15     Q.    And why did you borrow this money from
16 Mr. Ruppe?
17     A.    Just for personal, yeah, a small amount
18 of money.
19     Q.    What did you use the two payments of
20 $10,000 each for?
21     A.    Personal.  I don't really remember.  I
22 don't have it.  It was a long time ago.
23         MR. STANZIALE:  How long ago was it?
24         THE WITNESS:  2000, 2001, so I don't
25 remember.

**96**

1          MS. KANG:  We're nearing the finish
2  line.
3      Q.    So you stated earlier that Mr. Gordon
4  made a private mortgage to you.  Correct?
5      A.    Yes.
6      Q.    Do you know if Mr. Gordon has ever
7  provided private mortgages to any other people or
8  entities?
9      A.    I have no idea.
10     Q.    Do you know what Mr. Gordon's occupation
11 is?
12     A.    He's a mortgage representative.
13     Q.    And is this the only loan or mortgage
14 that he's ever provided to you?
15     A.    Yes.
16     Q.    Has he ever provided any gifts to you?
17     A.    Nothing.  Nothing besides this second
18 mortgage.
19     Q.    You said that initially he did not, he
20 was not interested in providing you the mortgage.  Do
21 you know why he changed his mind?
22     A.    He worked for another mortgage company
23 that did conventional lending, so if your credit
24 score is not a certain score, you can't get no loan.
25         MS. FREEDMAN:  But he provided it

**97**

1  personally, correct?  So what difference does it make
2  where he worked?
3          THE WITNESS:  Apparently Mr. Gordon and
4  his family, okay, created a mortgage company, and
5  it's located in Morristown.  But Mr. Gordon was the
6  one who loaned us the money, so any more than that, I
7  don't know the details.
8          MS. FREEDMAN:  But he initially used an
9  excuse that the company he was then working for was
10 uninterested?
11         THE WITNESS:  It wasn't an excuse.  It
12 was just plain simple qualifying.  If you have less
13 than a certain score, you're not going to qualify
14 under underwriting guidelines to get the money.
15         MR. STANZIALE:  And the afterwards he
16 called you up, or he contacted you later and said, "I
17 work for somebody else and I can get you the money?
18         THE WITNESS:  "I'm in a mortgage company
19 now with my uncle, or whatever, and I can help you,
20 so let's take another look."
21         So that's what took place.
22         MS. FREEDMAN:  I guess what had me
23 confused is if he works for a company and he said
24 that the new company would be interested, yet he made
25 the loan personally not through the company.

25 (Pages 94 to 97)

S. Kleinschmidt - cross

98

1       THE WITNESS: Right.
2       MS. FREEDMAN: So what difference would
3   it have made if he was doing the loan personally
4   anyway, why would he have rejected you originally if
5   it was a personal loan to begin with?
6       And I don't know if you know the answer
7   to that question, but I'm just saying I don't
8   understand.
9       THE WITNESS: Well, he worked for a
10  mortgage company, okay, as a mortgage rep. With the
11  regular guidelines with what that company provided, I
12  would not have qualified for a second mortgage.
13      Two months later, or a month later, or
14  whatever, he ended up working with -- having a
15  different environment, different situation for a
16  mortgage company with his family.
17      MS. FREEDMAN: Um-hum.
18      THE WITNESS: So that's all I knew,
19  understood. And at that point he said, "I might be
20  able to help you."
21      MS. FREEDMAN: But your credit score
22  didn't change in those two months, did it?
23      THE WITNESS: No, it got worse.
24      MR. STANZIALE: What you're missing is
25  what he said before. Before he testified that later

99

1   on, a few months later, he asked Mr. Gordon for more
2   money, to which Mr. Gordon replied, according to his
3   testimony, "I cannot give you more money because the
4   investor will not allow it."
5       So based upon that statement, it
6   probably could be assumed that Mr. Gordon was working
7   with somebody in the background to provide him this
8   money.
9       MS. FREEDMAN: Even though it was a
10  personally provided mortgage, the money came from
11  another source, it wasn't Mr. Gordon's money.
12      MR. STANZIALE: We don't know that.
13      THE WITNESS: I'm assuming that.
14      MR. STANZIALE: Based upon what he was
15  told, that certainly could lead to that conclusion.
16      MS. FREEDMAN: And when Mr. Gordon comes
17  in, I'll find out. But okay, thank you.
18  BY MS. KANG:
19      Q.    You mentioned that in addition to the
20  mortgage and the note with Mr. Gordon, there was also
21  a joint venture agreement that you entered into?
22      A.    Yes.
23      Q.    And I just -- I don't have the benefit
24  of having it in front of me, so I apologize if some
25  of these questions would have been answered by that

100

1   document, but can you tell us what the purpose of
2   that joint venture was?
3       A.    It's spelled out what we were doing
4   together, time frames, and his -- return of his money
5   and I was going to get it back, and how he was
6   getting paid $450,000 versus 350 that he lent me.
7       Q.    Okay. Was there a time frame provided
8   in the joint venture for the completion of the
9   construction of the property?
10      A.    No, not that I recall. I don't
11  remember. I don't know.
12      Q.    Did the joint venture agreement
13  contemplate that all of the funds that he provided
14  would be applied to the construction on the property?
15      A.    Say that again?
16      Q.    Under the joint venture agreement, did
17  you agree with Mr. Gordon that all of the moneys that
18  he was going to be providing as part of the mortgage
19  on the 318 Center Grove property would be applied to,
20  you know, whatever construction was going to occur on
21  that property?
22      MR. STANZIALE: And not personally,
23  you're saying?
24      MS. KANG: Right.
25      A.    Yeah, the money was borrowed to complete

101

1   the home, but I never received $350,000, either; but
2   that's what the initial intent was, yes, to borrow
3   the money to complete the home.
4       Q.    Did you ever ask Mr. Gordon for
5   additional moneys after the --
6       A.    Yes, I did.
7       Q.    Can you tell us a little bit about that?
8       A.    In September, about a month after, a
9   month and a half after the original closing. I
10  called him within a month.
11      Q.    And --
12      A.    And we met somewheres between September
13  12th and September 25th at Calaloo Cafe in
14  Morristown, he and his girlfriend.
15      Q.    I think you testified earlier that
16  nothing came of that?
17      A.    Well, it did. We went to pursue it.
18      Q.    Right.
19      A.    But by the time December came around,
20  her final answer after they had done their
21  appraisal -- they paid for an appraiser, you know,
22  and apparently the investor, they paid for an
23  appraiser, and that's when I received a phone call on
24  the 24th, Christmas Eve, after that.
25      Q.    And that was from Mr. Gordon's

26 (Pages 98 to 101)

S. Kleinschmidt - cross

**102**

1 girlfriend?
2     A.    Correct.  In fact, I believe I still
3 have that message taped.
4           MS. FREEDMAN:  Who holds the first
5 mortgage on the property?
6           THE WITNESS:  Huntington Mortgage.
7           MS. FREEDMAN:  And how much are they
8 owed?
9           THE WITNESS:  They're owed 800 -- their
10 note is $800,000 right now.  The arrearages for the
11 mortgage payments is around $40,000, plus taxes on
12 the property.
13           MS. FREEDMAN:  Is it in foreclosure?
14           THE WITNESS:  No.
15           MS. FREEDMAN:  And I know the answer,
16 but just who owns the property?
17           THE WITNESS:  It's in my name.
18           MS. FREEDMAN:  Just Stanley
19 Kleinschmidt, not with Mr. Gordon?
20           THE WITNESS:  Oh, no, no.
21           MS. FREEDMAN:  Not with anybody else.
22 Just you personally?
23           THE WITNESS:  Absolutely.  Yes, yes,
24 just me.
25           MS. FREEDMAN:  That's what I thought.

**104**

1 real estate.
2           MR. STANZIALE:  But does the joint
3 venture agreement say anything about you're putting
4 in a fireplace?
5           THE WITNESS:  No, it doesn't.
6           MR. STANZIALE:  I'm just using that as
7 an example.
8           THE WITNESS:  No, absolutely.  There's
9 no descriptives of what gets put in or what's not or
10 what has to be, no.
11     Q.    Other than the professionals that you
12 met with to try to figure out a way out of your
13 financial difficulties and your counsel, did you
14 share your decision to file bankruptcy petition with
15 anyone else?
16     A.    No.
17           MS. KANG:  I think that's it for me.
18           MS. FREEDMAN:  Okay.  I do want to let
19 you know that I found the handwritten closing
20 statement.
21           THE WITNESS:  Good.
22           MS. FREEDMAN:  So my apologies.  I
23 didn't see that previously.
24           And if you don't mind, I want to show it
25 to you and confirm that what I'm looking at is the

**103**

1           THE WITNESS:  Yes.
2           MS. FREEDMAN:  And not with your wife?
3           THE WITNESS:  No, we were both on it at
4 one time, and then we changed the deed because when
5 we purchased the property prior to that.
6           MS. FREEDMAN:  I think I saw a series of
7 deeds.  She owned it.
8           THE WITNESS:  It was way before this, it
9 was like three years ago we changed that.
10           MS. FREEDMAN:  Yeah, I saw that series
11 of deeds.  I just wanted to confirm that.
12           THE WITNESS:  Yeah, yeah.
13           MS. FREEDMAN:  See, I did see something.
14           THE WITNESS:  If you have something to
15 look at.
16 BY MS. KANG:
17     Q.    How did you know what kind of
18 improvements to make on the property at 318 Center
19 Grove?
20     A.    I'm a builder.
21     Q.    Okay.  So it wasn't part of, like, the
22 joint venture agreement, for example.  It was just up
23 to your discretion?
24     A.    No, I design homes, I build homes.
25 Okay?  I have 35 years experience in construction and

**105**

1 handwritten closing statement you previously had
2 referenced.
3           THE WITNESS:  Yes, that was quite the
4 document, yes.  Um-hum.
5           MS. FREEDMAN:  Thank you.
6           THE WITNESS:  Yes.
7           MR. STANZIALE:  Who wrote it?
8           THE WITNESS:  Victoria Brown.
9           MS. FREEDMAN:  Okay.  Thank you.
10           (The proceedings concluded at 3:50 p.m.)

27 (Pages 102 to 105)

106

```
 1              CERTIFICATE
 2
 3      I, LINDA M. HOFFMANN, a Notary Public and
 4   Certified Court Reporter of the State of New Jersey,
 5   License No. 30XI00099500, do hereby certify that
 6   prior to the commencement of the examination, STANLEY
 7   F. KLEINSCHMIDT was duly sworn by me to testify the
 8   truth, the whole truth and nothing but the truth.
 9      I DO FURTHER CERTIFY that the foregoing is a
10   true and accurate transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither
16   a relative nor employee of such attorney or counsel,
17   and that I am not financially interested in the
18   action.
19
20
21   _____
22   Notary Public of the State of New Jersey
23   My Commission expires December 14, 2013
24
25   Dated:  June 9, 2009
```

28 (Page 106)

```
 1                    JURAT

 2              I, _____, do

 3     hereby certify that I have read the

 4     foregoing transcript of my testimony,

 5     taken on _____, 2009, and have signed

 6     it subject to the following changes:

 7     PAGE  LINE        CORRECTION        REASON

 8

 9

10

11

12

13

14

15

16

17

18

19
                       _____
20

21

22     Sworn and subscribed to before me on this

23     _____ day of _____, 2009.

24

25     NOTARY PUBLIC   _____
```